Gene BATTLE et al.,
Plaintiffs-Appellants,

v.

CLARK EQUIPMENT COMPANY, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its Local No. 1265, Defendants-Appellees.

No. 77–1236.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 28, 1977.

Decided June 29, 1978.

---

Lawrence C. DiNardo, South Bend, Ind., for plaintiffs-appellants.

John S. Schauer, Chicago, Ill., Leonard R. Page, UAW Legal Dept., Detroit, Mich., for defendants-appellees.

Before CUMMINGS, SPRECHER and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiff-Appellant Gene Battle and twenty-four others (appellants) brought an

action against Clark Equipment Company (company) for breach of contract and against International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, and its Local No. 1265 (union), for failure to fairly represent them. Jurisdiction was invoked under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a).

The district court denied appellants' motion for partial summary judgment, granted the defendants' motions for summary judgment and ordered the dismissal of the company's cross-claim against the union. We affirm.

## Facts

This dispute arose from actions taken by the company and the union upon the closing of the company's Brown Trailer Division in Michigan City, Indiana. Appellants were employed by the company as production and maintenance workers until January, 1975. In November, 1974, the company announced that it had decided to close its Brown Trailer Division and that the entire work force would be permanently laid off. The union subsequently met with the company to negotiate an agreement in light of the plant closing. It is with respect to these negotiations and the purported ratification of the subsequent agreement that appellants allege a breach of contract against the company, and a breach of the union's duty of fair representation.

On January 5, 1975, a special union meeting was held for the purpose of discussing an amendment to the Supplemental Unemployment Plan (SUB plan), contained in Article XXV of the Collective Bargaining Agreement. The SUB plan provided for regular weekly benefits payable to any qualified employee laid off during the course of employment. During the previous negotiations with the company, the un-

ion had requested that the company freeze the SUB plan and, upon ratification of an amendment agreement, distribute the SUB plan's funds on a pro rata seniority basis, along with making other demands of the company not relevant here.[1] The company acquiesced in the union's demands. At the January 5, 1975 meeting, union officials spoke in favor of the freeze and pro rata distribution explaining that unless regularly expected SUB plan payments were discontinued, the funds would be depleted through payment of unemployment benefits to those with less seniority who would be laid off in the earlier stages of the company's phase-out of the Brown Trailer Division. Appellants allege they were prevented from fully expressing their views at this meeting. A secret ballot election was conducted which resulted in the change being approved by a vote of 209 to 39.

By its own terms, the amendment agreement was not to become effective until it was executed by authorized representatives of the parties and at least 90% of those employees who had SUB plan credits as of December 29, 1974. To be included within the signatures of such employees were the signatures of 100% of all employees who were on layoff from the company on the date on which the union notified the company in writing that the membership of Local No. 1265 had ratified the amendment agreement. (Amendment Agreement, Section B.) This included the appellants in this action. Upon ratification, the parties met to negotiate the technical language of the amendment agreement and regular SUB plan distributions ceased.

By April, 1975, all but seven or eight workers had signed the amendment agreement. In order to secure their signatures, the company paid these workers (none of whom are appellants in this action) to sign releases. Subsequently, several of the ap-

1. During the negotiations between the union and the company the union demanded severance pay, additional health and life insurance coverage, additional disability, sickness and ac-

cident coverage, pro rata vacation pay for 1975, relocation rights to other company plants and additional contributions to the SUB plan.

pellants asked to have their names removed from the list. Their requests were denied. In June, 1975, after all signatures had been obtained, the pro rata distribution of the SUB plan fund was made. Appellants allege that their signatures were fraudulently obtained.

After being laid off, the appellants applied for SUB benefits as if there had been no modification of the plan, but no action was taken on their applications. Without seeking further redress from the union or the company, appellants filed this suit in the district court on July 23, 1975.

As against the union, in addition to attacking the fairness of the amendment agreement itself, appellants allege that their signatures were obtained by fraudulent misrepresentations and that there were irregularities in the January 5 meeting, all in violation of the union's duty of fair representation. As against the company, appellants argue that since the SUB plan amendment was improperly executed and ratified, the company's failure to pay them their benefits under the premodification plan constituted a breach of contract. They also argue that the company discontinued payment of SUB benefits before the earliest date on which the · amendment could have become effective under its own terms. Lastly, appellants contend that neither the union nor the company had the power to amend the SUB plan because of the existence of a contract clause prohibiting either of them from requesting any modification of the plan during the life of the collective bargaining agreement.[2]

The district judge granted the union's motion for summary judgment on the ground that the appellants had not exhausted the intra-union remedies open to them or

shown that an attempt to do so would have been futile. The judge also found that the appellants had not demonstrated that the union had engaged in any "arbitrary, discriminatory or bad faith conduct" in violation of its duty of fair representation. The court granted the company's motion for summary judgment on the ground that appellants had unjustifiably failed to exhaust the contract grievance procedures open to them. Appellants now appeal to this court pursuant to 28 U.S.C. § 1291.

*The Employees' Failure to Exhaust Intra-Union Remedies as a Defense to Their Unfair Representation Suit Against the Union.*

■ Appellants do not quarrel with the general proposition that "[w]here . . . there is no question as to the adequacy and mandatory nature of the intra-union remedies it is well settled that an exhaustion of the remedies is an indispensable prerequisite to the institution of a civil action against a union." *Newgent v. Modine Manufacturing Co.*, 495 F.2d 919, 927 (7th Cir. 1974). *Accord, Harrison v. Chrysler Corp.*, 558 F.2d 1273, 1277 (7th Cir. 1977); *Orphan v. Furnco Construction Corp.*, 466 F.2d 795 (7th Cir. 1972). The exhaustion obligation is embodied in the union's constitution and is contractually assumed by the employee when he joins the union.[3] *Harrison v. Chrysler Corp., supra*, at 1278–79. It is also based on a policy of avoiding "judicial interference with the internal affairs of a labor organization until it has had at least some opportunity to resolve disputes concerning its own legitimate affairs." *Id.* at 1278, quoting from *Brady v. Trans World Airlines, Inc.*, 401 F.2d 87, 104 (3d Cir. 1968), *cert. denied*, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969). Such internal exhaus-

---

**2.** The complaint also originally alleged that the modification of the plan was racially discriminatory in violation of Article I, Subsection 4, of the Collective Bargaining Agreement. This unsupported allegation has apparently been abandoned.

**3.** Article 33, Section 12 of the 1974 UAW Constitution states:

It shall be the duty of any member or subordinate body who feels aggrieved by any action, decision, or penalty imposed upon him or it, to exhaust his or its remedy and all appeals therefrom under the laws of this International Union prior to appealing to a civil court or governmental agency for redress.

tion requirements are permitted by the proviso to Section 101(a)(4) of the Landrum-Griffin Act, 29 U.S.C. § 411(a)(4), as long as the procedures do not exceed a four-month lapse of time.[4] *See generally* Simpson & Berwick, *Exhaustion of Grievance Procedures and the Individual Employee,* 51 Tex. L.Rev. 1179, 1214–26 (1973).

■ The general adequacy of the UAW's intra-union remedies [5] has already been judicially recognized. *See, e. g., Newgent v. Modine Manufacturing Co.,* 495 F.2d 919 (7th Cir. 1974); *Fleming v. Chrysler Corp.,* 416 F.Supp. 1258 (E.D.Mich.1975). However, appellants argue that the union is incapable of granting them the relief that they seek. They contend that in view of the fact that the union contractually agreed with the company to amend the SUB plan, the union is not in a position to unilaterally restore appellants' rights under the premodification agreement. Although this technically may be true, the contract rights in question consist solely of appellants' claimed entitlements to receive monetary payments of a determinable amount. Since it is not contested that the intra-union appeal procedures provide for the awarding of monetary damages in appropriate cases,[6] it is clear that appellants can be made whole within the context of the intra-union machinery. Moreover, if the union is incapable of offering the appellants effective relief voluntarily, it is difficult to see how it would be any more capable of doing so pursuant to a court order stemming from a successful showing by the appellants of a breach of the union's duty of fair representation.

■ The first step in the UAW internal appeals process consists of placing the grievance before the membership of the relevant local for a vote. Appellants argue that in the present case this would be a futile gesture, since that body is effectively controlled by the union leaders who brought about the amendment of the SUB plan in the first place. Whatever the merit of that proposition, appellants do not go on to suggest that the review boards to which appeals of the vote of the local membership can be taken are biased or are otherwise incapable of conducting an independent review of the situation. We therefore see no reason for questioning the adequacy of the intra-union remedies on this basis.

■ Appellants next assert that exhaustion is inappropriate because the questions involved are not matters of union discipline and internal policy. We do not agree. Appellants' most significant claims center on their allegations of irregularities at the January 5 union meeting and of the commission of fraud by the local union leaders in the collection of ratification signatures. These are issues of significant internal concern for the UAW. The Supreme Court's

---

4. 29 U.S.C. § 411(a)(4) provides:

(4) Protection of the right to sue.—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any*

*officer thereof: And provided further,* That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition. (emphasis added.)

5. Article 33 of the 1974 UAW Constitution provides for an initial decision by the complaining member's local union, with appeal to the International Executive Board. Decisions of the latter can be appealed to an independent Public Review Board and thence to the UAW's constitutional convention.

6. See, *e. g.,* the unrebutted affidavit of David Klein, the Executive Director of the Public Review Board.

decision in *NLRB v. Marine Workers*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968), upon which appellants place great reliance, is distinguishable. There, a union member sought to bring unfair labor charges against his union before the NLRB. Writing for the majority, Justice Douglas found that the employee was properly excused from exhausting intra-union remedies before resorting to the NLRB so that the "whole complex of public policy issues" presented by the case might be expeditiously raised. However, the public policy aspects of labor disputes are of greater importance in unfair labor practice suits before the NLRB than in Section 301(a) suits, which focus more on the vindication of private contract rights. In addition, the allegations in the present suit do not raise questions of public policy of the same sort as those involved in *Marine Workers*, where the underlying question was whether it was an unfair labor practice for a union to expel a member for filing a suit with the NLRB in the first place.[7]

■ Lastly, appellants attempt to excuse their failure to exhaust intra-union remedies on the grounds that exhaustion is not required "where the internal remedy is not clear or is not brought to the attention of the aggrieved member." Unlike most of the cases cited by the appellants in support of this contention, in the case at bar the existence of a working mechanism for resolving disputes is not in doubt. In addition, the appellants' attorneys were provided with a copy of the UAW constitution before this suit was filed. An internal appeal could have been initiated at that time. Moreover, this court has found that union members have a "duty to become aware of

the nature and availability of union remedies" when they join the union. *Newgent v. Modine Manufacturing Co.*, 495 F.2d at 928.

In short, we find that there is no real question as to the adequacy or availability of the UAW intra-union remedies and that the district court properly granted the union's motion for summary judgment on the ground that the appellants failed to exhaust them.

*The Employees' Failure to Exhaust Available Contract Grievance Procedures as a Defense to Their Claim Against the Company.*

■ The district court dismissed the appellants' complaint against the company because they failed to exhaust the available contract grievance procedures before filing suit. Article VII of the Collective Bargaining Agreement sets up grievance procedures for resolving "dispute[s] involving the interpretation and application of the provisions of [the collective bargaining] agreement," including provisions for arbitration. In addition, Article V, Section 3 of the Supplemental Unemployment Benefit Plan provides for an internal appeals procedure for the resolution of disputes concerning the denial of SUB benefits or the "interpretation or application" of the SUB plan. The company argues that because the appellants' claims are actually based on violations of the collective bargaining agreement, they were required to exhaust the collective bargaining agreement grievance procedures and have not justified their failure to do so. The appellants argue that only the SUB plan appeals procedure was applicable and that since the company nev-

7. We believe that the present case is distinguishable from the situation in *Chambers v. Local Union 639*, 188 U.S.App.D.C. ——, 578 F.2d 375, L.R.R.M. 2823 (1978), cited by the appellants as additional authority pursuant to Circuit Rule 11. The *Chambers* case, which involved a question of dovetailing of seniority, presented a situation in which the intra-union remedies were inadequate since the union would have been incapable of unilaterally restoring the plaintiffs' seniority. The court also found that the plaintiffs' grievances raised "a matter that is in the public domain" which "focuses on the *employment relationship* rather than the union relation." 97 L.R.R.M. at 2831–32. In contrast, in the case at bar we find that the intra-union remedies are capable of making the employees whole and that their allegations raise questions of great internal union concern.

er responded to their applications for benefits, they were justified in not seeking to further exhaust those procedures. They also argue that since their claims for relief are based on allegations that the union and the company acted in concert to deprive them of their contract rights, they were excused from exhausting the grievance procedures which are jointly controlled by the union and the company. The district court accepted the position of the company and granted summary judgment in favor of the latter because of the appellants' failure to exhaust the collective bargaining agreement grievance procedures. We agree with the company that the contract grievance procedures are the proper ones to consider, but we also agree with the appellants' contentions that the nature of their claims is such that exhaustion of those procedures may be excused. The road leading to the latter conclusion begins with a closer look at appellants' claims against the company.

Appellants' claims against the company are primarily based on the contention that the amendment to the SUB plan was improperly executed and ratified and that therefore the company must accord them their rights under the premodification agreement. The first allegation of impropriety is that by asking the company to agree to an amendment to the SUB plan the union violated the "zipper clause" contained in Article XXV of the collective bargaining agreement which prohibits either party from requesting any change in the SUB plan during the life of the collective bargaining agreement.[8] Secondly, there is a contention that the nature of the changes in the SUB plan sought by the union and agreed to by the company manifests such a

disregard of the interests of the appellants as to constitute a breach by the union of its duty of fair representation. Lastly, appellants allege that the local union leaders engaged in fraud and improper conduct in the way in which they ran the January 5 meeting and gathered the ratification signatures.

The distinguishing characteristic of these claims is that they do not rest on any allegations of misconduct by the company other than the latter's acquiescence in the union's demands for a modification of the SUB plan. Any pursuit of these claims through the grievance apparatus would necessarily involve proof of wrongdoing on the part of the union. This leads to the anomalous result that, because of the union's indispensable role in shepherding a grievance through the various levels of the grievance machinery[9] a successful prosecution of the appellants' grievances would depend on the union aggressively proving its own misconduct. Even if the appellants had been able to convince a UAW review board that they had been unfairly represented by the local union leaders, any prosecution of the appellants' grievances against the company would still require proof of union misconduct, with the possibility of a cross-claim or subsequent suit by the company against the union for indemnification or contribution. We do not believe that the law of the exhaustion of contract remedies requires the appellants to place themselves in such a position. Because of the obvious conflict of interest between the union and the appellants with regard to a vigorous assertion of the appellants' grievances, a basic assumption underlying the contract provisions setting up the grievance machinery has been

**8.** More completely, Article XXV, Section 4 provides:

> During the term of this Agreement neither the Company nor the Union shall request any change in, deletion from, or addition to the Plan, or be required to bargain with respect to any provisions or interpretation of the Plan, nor shall any dispute or difference arising in any negotiations provided herein be an objective of, or a reason or cause for, any action or failure to act including, but not

> limited to, any strike, slowdown, work stoppage, lockout, picketing, or other exercise of economic force, or threat thereof, by the Union or the Company. (emphasis added).

**9.** Under Article V of the Collective Bargaining Agreement an employee may file a grievance with the company on his own initiative. But all of the subsequent steps require action by the union.

violated.[10] We believe that this situation constitutes one of the types of situations contemplated by the Supreme Court in *Vaca v. Sipes*, 386 U.S. 171, 184–85, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967), when it said:

> [I]t is well settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, [85 S.Ct. 614, 13 L.Ed.2d 580]. However, because these contractual remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable for the individual grievant. The problem then is to determine under what circumstances the individual employee may obtain judicial review of his breach-of-contract claim despite his failure to secure relief through the contractual remedial procedures.

A similar exception for cases involving allegations of a "conspiracy" between the union and the employer to deprive employees of their rights has been recognized by other circuits. *Lusk v. Eastern Products Corp.*, 427 F.2d 705 (4th Cir. 1970); *Desrosiers v. American Cyanamid Co.*, 377 F.2d 864 (2d Cir. 1967); *Hiller v. Liquor Salesmen's Union*, 338 F.2d 778 (2d Cir. 1964). This result also comes within a broad reading of the "futility" exception recognized by the Supreme Court in *Glover v. St. Louis-S. Francisco R.*, 393 U.S. 324, 330–31, 89 S.Ct. 548, 21 L.Ed.2d 519 (1968).

We therefore conclude that the district court's granting of summary judgment in favor of the company cannot be sustained on the ground that the appellants failed to exhaust the contract grievance procedures. However, having reviewed the record and the district court's findings of fact, we conclude that summary judgment in favor of the company was proper on the ground that the appellants failed to establish a Section 301(a) claim against the latter.

*The Employees' Failure to Establish a Section 301(a) Claim Against the Company.*

■ The principal allegations of the complaint involving a direct violation of the collective bargaining agreement by the company are the claim that the company violated the non-discrimination clause of the contract—a claim which has since been abandoned—and the claim that the company breached the SUB plan agreement by discontinuing the payment of benefits before the amendment agreement had become effective by its own terms. It is true that benefit payments were discontinued in January and that the signatures needed for ratification were not collected until June. However the "freeze" on benefit payments was made pursuant to an agreement sought by the union and acquiesced in by the company. Similarly, although the amendment agreement did not become effective until June, it was made retroactive to the date of the "freeze." Thus, the discontinuance of the benefit payments did not violate the collective bargaining agreement as amended.

**10.** One might argue that there is a possible inconsistency between our finding that the nature of the appellants' claims is such that it would be futile to require exhaustion of the contract grievance procedures because of the union's conflict of interest therein and our finding that the employees must exhaust the intra-union remedies in spite of the fact that this would require the same union to sit in judgment on itself. However, there are important differences between the two situations. The intra-union remedies are set up on the assumption that there is a disagreement between the local union leadership and the employee. The contract grievance procedures assume an ab-

sence of such a conflict. The intra-union exhaustion requirement is based in part on the policy of permitting the union to attempt to resolve internal problems in house before they are brought to the public courtroom. In contrast, pursuit of a grievance through the grievance machinery would require the union to publicly declare its own wrongdoing. Lastly, since the union plays the role of sole advocate of the grievant's cause under the contract remedies, any functional conflict of interest would mean that the grievant's case might not be made with adequate forcefulness. In the intra-union remedies, the employee can present his own case.

The appellants also seem to suggest that the company directly violated the labor agreement's "zipper clause" by agreeing to the SUB plan modification.[11] That clause merely prevents either party from requesting a modification of the SUB plan from the other party during the life of the collective bargaining agreement. It does not forbid the other party from agreeing to such a request or forbid a modification *per se*. Since it is undisputed that it was the union rather than the company that sought the change in the SUB plan, it cannot be said that the company directly violated the language of the "zipper clause."

The rest of the appellants' claims against the company seem to proceed on the theory that the union's actions with respect to the contract modification constituted violations of the existing agreement and its statutory duty of fair representation; that the company acquiesced in this misconduct by agreeing to the modifications; that the amendment agreement is therefore void; and that as a consequence, the company's failure to provide the appellants with full SUB benefits constituted a breach of the SUB plan as it would have read without considering the void amendments.

The allegations that the union violated the existing contract by seeking to amend the SUB plan again relate to the "zipper clause." It cannot be disputed that by requesting that the company enter into a modification of the SUB plan, the union violated the language of that clause. However, we do not believe that this violation can be invoked by the appellants as a basis for seeking relief against the company. The purpose of the "zipper clause" is to allow both the union and the company to rely on the final bargaining agreement without one party being able to force the other party into premature renegotiations every time that there is a shift in relative bargaining power. The clause was not intended to prevent the parties from mutual-

ly agreeing to an amendment to the labor contract when they both believe that a modification has been made necessary by changed circumstances. As Justice Goldberg said in *Humphrey v. Moore*, 375 U.S. 335, 353–54, 84 S.Ct. 363, 374, 11 L.Ed.2d 370 (1963) (concurring opinion):

> The parties are free by joint action to modify, amend, and supplement their original collective bargaining agreement. . . . There are too many unforeseeable contingencies in a collective bargaining relationship to justify making the words of the contract the exclusive source of rights and duties.

Thus, we do not believe that the "zipper clause" was intended to create vested rights in the employees under the labor contract which the union and the company could not change by mutual agreement. *See International Longshoremen's and Warehousemen's Union v. Kuntz*, 334 F.2d 165, 171 (9th Cir. 1964). Whatever rights may have been affected by the union's breach of the clause belonged to the company, not the employees.

The appellants' remaining claims are based not on allegations that the union's actions with regard to the modification of the SUB plan violated the collective bargaining agreement, but that they violated the union's statutory duty of fair representation. In order to make out a breach of this duty, the appellants must show that the union's actions were "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1966). Here, the district court made a finding that the union did not engage in any "arbitrary, discriminatory, or bad faith conduct." (Conclusion of Law No. 20). If this conclusion was properly drawn from undisputed facts, Fed.R.Civ.P. 56(c), the appellants' remaining claims must fall.

Appellants first argue that the very terms of the amendment agreement manifest a failure on the part of the union

11. See n. 8, *supra*.

to fairly represent their interests. We cannot concur. The amendment agreement required a vote of 90% of all employees with SUB plan credits in order to become effective, as well as the signatures of 100% of those employees actually on layoff at the time. Since the appellants all fell into the 100% category, they each in effect had a veto over adoption of the amendment. Thus, on its face the plan provided for adequate protection of the appellants' interests. Furthermore, we do not believe that the modification of the SUB plan to provide for a distribution of the limited funds according to seniority rather than date of layoff can be viewed as being arbitrary or discriminatory. The company planned to shut down the plant in three stages over a number of months. By the time that the employees with the greatest seniority were to be laid off, the SUB fund would have been completely exhausted. Yet, the employees with the greatest seniority were those on whose behalf the greatest contributions to the fund had been made. The decision to freeze the fund and make liquidating payments to the workers according to the amount of time worked, with each employee receiving something, therefore seems equitable. Although the appellants received less under the amended plan than they would have under the old agreement, that is not in itself enough to demonstrate a breach of the union's duty of fair representation. As the Supreme Court stated in *Ford v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1952):

> Any authority to negotiate derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented. . . . Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid.

> The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

Lastly, the appellants allege specific acts of bad faith and unfair conduct by the union with regard to the ratification of the amendment agreement. They allege that the union failed to provide adequate information at the January 5 meeting to permit individual members to determine if they would be better off under the proposed modification of the SUB plan or under the existing plan and that the union leadership ruled out of order several of the appellants when they tried to speak out against the plan and threatened to remove one of the appellants from the meeting hall. They also allege that their signatures were later obtained for the ratification list by fraudulent misrepresentations, in that they were told that their signatures were needed in order to receive vacation fund payments and that the amendment agreement was never shown to them or explained to them. These allegations which are supported by the appellants' joint affidavit, clearly raise questions of fraud and bad faith on the part of the union leaders. Although the union's counter-affidavits relate a contrary view of these events and the district court found that there had been no union misconduct, we believe that there remain disputed issues of material fact which make it inappropriate to decide these questions on summary judgment. The question thus becomes whether, assuming that there was union misconduct with regard to the ratification process, the appellants can use this misconduct as a basis for obtaining relief against the company. We conclude that in the circumstances of this case they cannot.

It is well settled that a properly elected union is the exclusive representative of the employees in the collective bargain-

ing unit and that the employer has a duty to bargain in good faith with the union. See National Labor Relations Act, §§ 9(a), 8(a)(5), 29 U.S.C. §§ 159(a), 158(a)(5); R. Gorman, Basic Text on Labor Law, chs. XIX, XX. We believe that as a corollary, the employer cannot be held liable for the retroactive monetary relief when it relies in good faith on union actions or representations that are not obviously outside the scope of its authority. In the instant case, the agreements between the union and the company regarding the modification of the SUB plan provided that the union would notify the company when the amendments had been ratified by the required numbers of employees. The company was entitled to rely in good faith on the union's representations that the amendment agreement had been properly ratified without investigating whether the January 5 meeting had been fairly run by the union and whether the subsequent ratification signatures were all obtained without fraud or misrepresentations. These were more matters of internal union concern. There is no indication in the record that the company's reliance was not in good faith.[12] Nor were the union's actions clearly outside the scope of its authority, such as in *Steele v. Louisville & N. R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), where the contract provisions sought by the union were racially discriminatory on their face.

The present case is different from the situation in *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1966), and *Hines v. Anchor Motor Freight*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), where the employers were not permitted to raise as a defense the employees' failure to exhaust contract grievance procedures in breach of

contract suits against the employers where there was a showing of a breach of the union's duty of fair representation with respect to its role in the grievance proceedings, even though the employers in no way participated in the union's breach. In *Vaca, supra* 386 U.S. at 185–86, 87 S.Ct. at 914, the Supreme Court said:

It is true that the employer in such a situation may have done nothing to prevent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement. But the employer has committed a wrongful discharge in breach of that agreement, a breach which could be remedied through the grievance process to the employee-plaintiff's benefit were it not for the union's breach of its statutory duty of fair representation to the employee. To leave the employee remediless in such circumstances would, in our opinion, be a great injustice. We cannot believe that Congress, in conferring upon employers and unions the power to establish exclusive grievance procedures, intended to confer upon unions such unlimited discretion to deprive injured employees of all remedies for breach of contract. Nor do we think that Congress intended to shield employers from the natural consequences of their breaches of bargaining agreements by wrongful union conduct in the enforcement of such agreements.

The majority opinion further stated that "[t]he governing principle . . . is to apportion liability between the employer and the union according to the damage caused by the fault of each." *Id.* at 197, 87 S.Ct. at 920. In the instant case there is no showing of independent wrongdoing by the employer, who was essentially a neutral

---

12. Appellants' joint affidavit states that six of the appellants approached Donald Herbst, a personnel manager for the company, to ask that their signatures be removed from the ratification list. According to Herbst's affidavit, this occurred on June 16, 1975. Herbst advised the six employees that the signature sheets were then at the company's general office in Michigan. He checked with headquarters and found that the liquidating distribution of the SUB fund had already been made. Earlier, employees had been allowed to remove their signatures from the list at their request. There is no suggestion that the appellants told the company that their signatures had been fraudulently obtained. These facts do not give rise to any indication that the company's reliance was not in good faith.

stakeholder with regard to the SUB plan fund. We do not believe that in enacting Section 301(a) Congress intended to permit the awarding of retroactive monetary relief against an employer whose only fault has been to rely in good faith on the representations of the union leaders that the union membership had properly ratified the amendments. In *Hines v. Anchor Motor Freight*, 424 U.S. at 572–73, 96 S.Ct. 1048 (Stewart, J., concurring), it was suggested that even if there were an eventual determination of wrongful discharge of the plaintiff, the employer should not be held liable for back pay for that period in which he was relying in good faith on the determination of the arbitrator that the discharge was proper. Similar reasoning should apply here. See also *Humphrey v. Moore*, 375 U.S. at 351–59, 84 S.Ct. 363 (Goldberg, J., concurring), and at 359–60, 84 S.Ct. 363 (Harlan, J., concurring in part and dissenting in part). A different result might be obtained if the appellants were seeking purely prospective or declaratory relief, *id.* at 343, 84 S.Ct. 363 (White, J.), or if the question were one of employer liability under Section 2 (Fourth) of the Railway Labor Act, 45 U.S.C. § 152 (Fourth). *See Brady v. Trans World Airlines, Inc.,* 401 F.2d 87 (3d Cir. 1968). However, in the instant case we find that the appellants have failed to make out a cause of action in this respect.[13]

The judgment of the district court is

AFFIRMED.

13. Even if the appellants' complaint is construed as seeking a declaratory judgment that they have valid claims on the SUB fund, we believe that the company may successfully argue that its liability is limited to its contributions to the fund and that the latter was exhausted by the liquidating distribution made in good faith reliance on the union's representations.