Henry PARKER et al., Plaintiffs,

v.

LOCAL 413, INTERNATIONAL BROTH-ERHOOD OF TEAMSTERS, CHAUF-FEURS, WAREHOUSEMEN AND HELPERS OF AMERICA et al., Defend-ants.

No. C-2-78-613.

United States District Court, S. D. Ohio, E. D.

May 21, 1980.

Robert K. Handelman, Columbus, Ohio, for plaintiffs.

Jerry L. Riseling, Perry, Riseling & Boyuk, Columbus, Ohio, for Local 413.

Robert F. Weaver and Nanci Danison, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Consolidated.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court for final disposition upon a trial to the Court. The plaintiffs allege that their local union and their employer have violated the collective bargaining agreement and the federal labor laws by implementing a contract modification without giving the employees a meaningful opportunity to ratify that modification. Specifically, it is alleged that the failure to give the employees reasonable notice of the ratification vote, to permit the employees ample time to discuss the issue, to provide safeguards adequate to ensure the accuracy of the vote and to investigate charges of impropriety thereafter violated the collective bargaining agreement and the union's duty of fair representation. Based upon the evidence adduced at trial, the post–trial memoranda of the parties and the other materials before it, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52, F.R.C.P.

### Findings of Fact

The plaintiffs in this action are two members in good standing of the defendant Local 413 of the International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America [the Union]. The plaintiffs are employed at the Columbus terminal of the defendant Consolidated Freightways Corporation of Delaware [the Company], a corporation engaged in the motor freight business.

Both the Company and the Union were signatories to the National Master Freight Agreement and Central States Area Local Cartage Supplemental Agreement for the period April 1, 1976 through March 31, 1979. Article 61, § 1 of the agreement provides in part as follows:

The Employer and the Local Union mutually agree that upon proper notice by the Employer to the Local Union and *upon fulfilling certain mutually agreed to standards,* break–bulk terminals may be established with a flexible work–week for dock and yard operations only.

Joint Exhibit I at 127 [emphasis added].

The "flexible work–week," if established, would permit the Company to begin a given employee's work week on any day of the week, instead of only on Monday or Tuesday under Article 61. The advantage to the Company would be the fact that overtime payments would be reduced substantially on Saturdays and Sundays, which would become regular workdays for an employee whose flexible work–week began, for example, on a Thursday or Friday. *See* plaintiff's Exhibit 3, Article 3, § 2.

The "certain mutually agreed to standards" established by the Company and the Union, and approved by the Central States Joint Area Committee, are contained in the "Ohio Joint State Committee Guide Lines for Operation of Flexible Work Week" [the Guidelines]. Article 7 of the Guidelines provides as follows:

1. Implementation and/or modification of these guide lines must meet the following conditions:

   A. Approval of the Local Union.

   B. Acceptance by the majority of the employees (51%) affected at the facility in question.

   C. Sanction of the Ohio Joint State Committee.

As early as December, 1977, Mr. Paul Kelly, the Terminal Manager at Columbus, contacted the Union on behalf of the Company seeking implementation of the flexible work week. Between December, 1977 and March, 1978, he had numerous other discussions with union representatives in an effort to promote the flexible work week.

In early March, 1978, Mr. Kelly began calling small groups of employees into his office to discuss and explain the proposal. He testified that these sessions lasted approximately thirty to forty–five minutes,

and that he spoke in this fashion to virtually every employee affected by the proposed change.

At these sessions Mr. Kelly stressed the Company's need for the flexible work week. He cited examples of companies which had left Columbus because, he said, they had been unable to obtain a flexible work week. He stated that it was possible that the Company would have to leave Columbus as well if the collective bargaining agreement was not modified to permit the flexible work week.

The Union was informed of these meetings by Mr. Kelly, but no union representative was present. Nor were there any union–sponsored discussions of the issue during or prior to that period in early March.

On Friday, March 3, 1978 Mr. Kelly requested that the union conduct an election on the proposal as soon as possible. The request was made to Mr. Don Linville, the Secretary–Treasurer of Local 413. Mr. Linville stated that he would be out of town for a period after March 9, 1978, and Mr. Kelly requested that the election be held prior to his departure. On Monday, March 6, 1978 Mr. Linville and Mr. Kelly agreed that the election would be held on March 9, 1978. No notice was given to the employees at that time that the election had been scheduled.

The next day, March 7, 1978, a notice was posted at the terminal advising the employees that a meeting would be held on March 22, 1978, for the purpose of discussing the flexible work week. The notice was signed by the Vice President of Local 413. Both Mr. Linville and Mr. Kelly were aware that the notice had been posted, and that it contained no reference to an election date.

On the evening of March 8, 1978, the plaintiff James Irwin, who was the union steward, was called at home by a Company supervisor and informed that the vote would be taken the next morning. Mr. Irwin attempted to call the union hall, but it was closed.

Mr. Kelly testified that he informed the employees at the small group meetings he held on or after March 7 that the election would be held on March 9, but there was no indication as to the number of employees who would have been so notified. Nonetheless, the testimony of the employees at trial established that the overwhelming majority of all employees who voted had no indication that the election was at hand until the morning of March 9.

On that morning, the departing night shift and the arriving first shift workers were instructed to go to the basement for a meeting and a vote on the flexible work week. The Union representatives there to conduct the election were Mr. Linville, Mr. Carter, the Vice–President, and Mr. Kitchen, the Business Agent of the Local.

The Union representatives opened a discussion of the flexible work–week. Numerous questions were raised concerning both the proposed modification of the contract and the adequacy of notice for the impending vote. The testimony established that the discussion was loud, emotional and disorganized. Those who raised strenuous objections to the sudden advent of the election, including the plaintiffs, were finally told to "shut up."

After approximately thirty or forty minutes, Mr. Kelly arrived at the meeting with ballots which had been typed by his secretary. The ballots were simply headed "Flexible Work Week," with the words "Yes" and "No" appearing thereunder. Mr. Kelly reiterated the position of the Company with respect to the proposal, and answered some questions. He then helped to distribute and count the ballots.

Each employee was told to sign a sheet of paper and to give his social security number before casting a ballot. It appears that three employees were unaware of the existence of the "sign–in" sheet, and failed to sign the list, though they did vote. All three testified at trial that they did not sign in, but that they did vote.

One employee who voted was Mr. Keith High, who had made an agreement to pay an initiation fee to the Union in installments, but had not yet made any payments. He became a member in good standing of the local union in May of 1978.

After the balloting, a group of employees was informally designated to count the votes. One of the ballots had a mark between the words "Yes" and "No." All present, including the Union officers and Mr. Kelly, agreed that the ballot was improper and should not be counted. The final tally of votes at the morning session was Yes–21, No–18, and one ballot disqualified. A total of forty employees had voted.

After the votes were counted, an employee named George Holland approached Mr. Kelly and stated that he had cast the disqualified ballot, and had intended it to count as a "Yes" vote. Mr. Kelly told him to see Mr. Linville at the union hall.

The second shift employees voted at the end of their shift that afternoon. The balloting procedures were essentially the same as in the morning. Prior to the second vote, Mr. Linville announced the result of the morning vote as 21–18 in favor of the flexible work–week. The second election's result was seven in favor and ten against the proposal. Despite these figures, which add up to a tie vote (28–28), or a victory for the proposal by one vote if the disqualified ballot was counted (29–28), an evident addition error resulted in the tally being represented as 31–28 in favor of the proposal.

On the following day, Mr. Kelly prepared a memorandum purporting to certify the result of the election as 31–28 in favor of the flexible work–week. This memorandum was signed by an alternate union steward, and Mr. Kelly then took it to the union hall for signature by Mr. Linville. A supplement to the National Master Freight Agreement was also prepared and signed on March 10, 1978 by the President of Local 413.

There were a number of employees who were not at work on March 9 due to illness or leaves of absence. Two of these employees were contacted by other employees who informed them of the election. These two employees then came to the terminal and voted. There was no effort by the Company or the Union representatives to contact any employee who, while affected by the flexible work–week proposal, was not at work on March 9, 1978.

One such employee testified that he called in sick at 7:30 a. m. on March 9, but he was not told of the election. Another employee, on a holiday because March 9 was his birthday, came to work early in the evening to pick up his paycheck. He was informed that the election had been held and that he would not have an opportunity to vote.

There has been no dispute that the total number of employees on the seniority roster, that is, the total number "affected" by the flexible work–week, on March 9 was sixty–two. Five persons who were off work did not participate in the election. Thus, at the time of the election it was apparent that (1) fifty–seven employees voted, (2) only fifty–four names appeared on the "sign–in" sheet, and (3) the final result as published (31–28) indicated that fifty–nine employees had voted.

Within a week after the election, the President of the Union had been presented with a "mailgram" signed by thirty–two of the Company's employees, and a petition signed by forty–four employees, both protesting the impossibility of the election's result and the voting procedures. In addition, some employees, including the plaintiffs, had registered complaints to the union by telephone.

On March 17, 1978, counsel for the plaintiffs wrote a letter to the President of Local 413 registering the employees' complaints. In a letter dated March 31, 1978, counsel for the Union responded that he had "carefully reviewed the procedure followed by Local 413 in voting . . . " and that the procedure was proper. The letter also reaffirmed that the "total vote was 31 for the flexible work–week and 28 against." Plaintiff's Exhibit 8.

At the next regular Union meeting on April 16, 1978, the plaintiff Irwin was told not to raise the issue of the Consolidated Freightways election. He ignored the instruction. After the meeting, the President of the Union met with a large group of Company employees. The President told

them that their complaints would be fully investigated, and that the results of the investigation would be presented at a special meeting on April 22, 1978. He did not inform them that the amendment to the contract had been signed since the day after the election. A notice was posted at the terminal on April 17 announcing the special meeting.

The "investigation" of the election was conducted by Mr. Linville. He testified that his investigatory process consisted solely of reviewing the written tabulation of the votes. He quickly discovered, of course, that the 31–28 count was in error. He determined that the proper tally was 29–28. On April 21, 1978, George Holland, the admitted author of the ballot which was initially disqualified, executed an affidavit stating that the ballot in question was his attempt to vote in favor of the flexible work–week. Neither Mr. Linville nor any other Union official considered the procedural objections to the election process such as the lack of notice and the failure to include absent employees. On April 22, 1978, the special meeting was held at which time the President announced that the investigation had uncovered no irregularities and that the flexible work–week had been approved by a count of 29–28.

The flexible work–week was implemented on July 6, 1978. A grievance which purported to be on behalf of the "Employees of Consolidated Freightways" was signed by approximately fifty employees. It asked only that the implementation of the flexible work–week be post–poned until the National Labor Relations Board had ruled on an unfair labor practice charge filed with respect to the election. The grievance was not "filed" within the meaning of the collective bargaining agreement, but a copy was apparently shown to the Union officials at some point.

Subsequent to the implementation of the flexible work–week, Mr. Kelly testified, the Company hired approximately twenty new employees who now work in the break–bulk terminal. This action was filed in July of 1978 seeking to set aside the election, to obtain a declaratory judgment that the election violated the plaintiffs' rights and to recover attorney fees and costs.

### Discussion

The plaintiffs assert that the inadequate notice for the March 9, 1978 election and the numerous other alleged procedural inadequacies combined to make the ratification procedure required by the Flexible Work Week Guidelines arbitrary and meaningless. It is alleged that the Union has therefore violated § 101(a)(1) of the Labor–Management Reporting and Disclosure Act [LMRDA], 29 U.S.C. § 411(a)(1) and its duty of fair representation recognized in such cases as *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). It is alleged that the Company's imposition of the flexjble work–week, given its participation in the denial of a meaningful vote, constituted a breach of the collective bargaining agreement which this Court should remedy pursuant to the jurisdiction conferred by § 301 of the Labor–Management Relations Act [LMRA], 29 U.S.C. § 185(a).

The contractual provisions which govern the Court's decision are undisputed. It is agreed that the employees of the Company affected by the flexible work–week had a right conferred by the collective bargaining agreement (which adopted by reference the flexible work–week Guidelines) to ratify the proposed implementation of the flexible work–week. There is also no dispute that it was the ultimate responsibility of the Union to assert that contract right for the affected employees, that is, to schedule and conduct the ratification vote required by Article 7(1)(B) of the Guidelines.

Neither defendant has suggested to the Court that Article 7(1)(B) permits anything less than a meaningful vote. Both defendants have maintained instead that a meaningful election was in fact conducted in this case. An arbitrary (and therefore meaningless) vote is certainly no better than a fraudulent vote or no vote at all. The Court therefore notes the obvious fact that Article 7(1)(B) confers a contractual right on the employees to cast a ballot which is

neither arbitrary nor meaningless. The Court must therefore determine whether the manner in which the ballots were cast on March 9, 1978 deprived the employees of their contractual right to vote and, if so, whether the statutory provisions cited to the Court provide the plaintiffs with the relief they seek.

### A. Equal Voting Rights: 29 U.S.C. § 411(a)(1).

Section 101(a)(1) of the LMRDA provides in part as follows:

(a)(1) Equal rights.–Every member of a labor organization shall have equal rights and privileges within such organization . . . to vote in elections or referendums of the labor organization . . . .

29 U.S.C. § 411(a)(1). The initial question in this action is whether this provision of the so–called "bill of rights" for union members applies at all to the plaintiffs' claim.

In *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964) the Supreme Court stated that this provision of the LMRDA "forbids only unequal treatment as between members of a union." *Alexander v. International Union of Operating Engineers, AFL–CIO*, 624 F.2d 1235 at 1240 (CA 5, 1980). Since plaintiffs complain of a failure to ratify which affects alll union members equally, for better or worse, there can be no violation of Section 101(a)(1) in this case. Not surprisingly, some lower courts have construed this language to mean that when union actions (such as a failure to provide notice of an election) effectively render meaningless the right to vote of all employees equally, Section 101(a)(1) is not violated. *E. g., Werk v. Armco Steel Corp.*, 92 L.R.R.M. 3393, 3397 (S.D.Ohio 1976); *Black v. Transport Workers United of America, AFL–CIO*, 454 F.Supp. 813, 821 (S.D.N.Y.1978) (*citing, e. g., Gurton v. Arons*, 339 F.2d 371 (CA 2, 1964)). These cases hold, then, that employees can be deprived of the right to vote consistently with Section 101(a)(1) as long as all other such employees are deprived of the right to vote as well.

Other courts, often implicitly, have not read *Calhoon v. Harvey, supra*, to limit so severely the reach of Section 101(a)(1). Thus, the District of Columbia Circuit Court of Appeals has stated that

a union cannot immunize itself against charges of discrimination simply by affording each member the "mere naked right to cast a ballot;" the right each member has to vote must be "meaningful." Accordingly, the courts have found that the "equal right to vote" was denied, notwithstanding universal suffrage, . . . upon the occurrence of serious discrimination, [procedural] irregularities, or foul play at any stage of the electoral process.

*Bunz v. Moving Picture Machine Operators*, 567 F.2d 1117 (CA D.C., 1977). Among the cases cited in support of the proposition that Section 101(a)(1) creates a generalized right to cast a "meaningful" vote is *Blanchard v. Johnson*, 388 F.Supp. 208 (N.D.Ohio 1975), *aff'd in part and rev'd in part* 532 F.2d 1074 (CA 6, 1976) *cert. denied*, 429 U.S. 834, 97 S.Ct. 100, 50 L.Ed.2d 100 (1976). The Sixth Circuit in *Blanchard* did not expressly state this conclusion, though it is arguable that the Court's affirmance of the district court in that case cannot be otherwise justified.

If the Court agrees that the narrow interpretation of Section 101(a)(1) is mandated by *Calhoon*, then the plaintiffs state no claim against the union under this provision, because they have not alleged that any employee or group of employees was given an opportunity to cast a ballot more meaningful than theirs. The Court has determined, however, that this issue of statutory interpretation need not be finally resolved in this action for the reasons which follow.

There is no question that this section of the statute creates a cause of action against the Union only. "As a matter of law no relief can be granted under these provisions against an employer . . . ." *Hayes v. Consolidated Service Corporation*, 517 F.2d 564, 566 (CA 1, 1976). The plaintiffs have neither requested, nor introduced evidence to support an award of money damages against the Union. No mandatory injunc-

tion against only the Union would have any meaning for these employees, for the employer would not be bound to rescind the flexible work–week even if a new election voted it down.

■ Thus, the only potential relief available to the plaintiffs if a violation of Section 101(a)(1) is established is a declaratory judgment that the plaintiffs' rights have been violated by the Union and an award of attorney fees. Under Rule 57, Federal Rules of Civil Procedure, and 28 U.S.C. § 2201, however, the Court has discretion in determining whether to entertain a claim for a declaratory judgment. *Southeastern Promotions Ltd. v. Conrad*, 486 F.2d 894 (CA 6, 1973) *rev'd on other grounds*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Where another remedy appears to be more effective and efficient, a court may be justified in refusing to grant a declaratory judgment. *Kister v. Ohio Board of Regents*, 365 F.Supp. 27 (S.D.Ohio 1973), *aff'd.*, 414 U.S. 1117, 94 S.Ct. 855, 38 L.Ed.2d 747 (1974). Because another remedy is available in this case, the Court has determined that it is unnecessary and unwise to resolve this difficult issue of statutory interpretation simply to issue a declaratory judgment which will serve no useful purpose. *See generally*, 6A *Moore's Federal Practice* ¶ 57.08[1] & [3].

*B. Section 301 Claims.*

The plaintiffs maintain that the conduct of the election, including the arbitrary scheduling, the haphazard administration of the voting, the lack of sufficient time to consider the issue, the failure to give absent employees an opportunity to vote and the failure to pursue the charges of irregularity made thereafter constituted a breach of the Union's duty of fair representation which may be remedied under Section 301 of the LMRA, 29 U.S.C. § 185. It is also maintained that the Company's involvement in the above mentioned irregularities make its subsequent implementation of the flexible work–week a breach of the collective bargaining agreement which also may be remedied under § 301.

*1. Exhaustion.* Both defendants argue that all claims under § 301 are barred by the failure of the plaintiffs to exhaust their remedies under the contractually provided grievance and arbitration procedure.[1] It is well established, of course, that employee plaintiffs in a § 301 suit may not "sidestep the grievance machinery provided in the contract." *Hines v. Anchor Motor Freight*, 424 U.S. 554, 563, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976). A suit for breach of a collective bargaining agreement must therefore be dismissed unless the employees have attempted to use the contractual procedures. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

■ There are situations, however, in which the employer may not rely on the exhaustion requirement to defeat a claim of breach of contract. *Vaca v. Sipes*, 386 U.S. 171, 184–85, 87 S.Ct. 903, 913–14, 17 L.Ed.2d 842 (1967). One situation is where the union has breached its duty of fair representation in processing the plaintiff's grievance. *Hines v. Anchor Motor Freight, supra.* Another is where the circumstances show that filing and pursuing formal contract remedies would be "absolutely futile." *Glover v. St. Louis–San Francisco Railway Co.*, 393 U.S. 324, 331, 89 S.Ct. 548, 552, 21 L.Ed.2d 519 (1969).

In this case, it is amply apparent that an attempt by these plaintiffs to pursue formal contractual remedies would have been wholly futile. The allegation of the employees was that the Company and the Union had jointly deprived them of their right to a meaningful vote. Their initial prompt complaints went so completely unheeded that the impossible tally of 31–28 was still represented to be correct by the Union's counsel as late as March 31, 1978 after the election was "carefully reviewed." The Union officers demonstrated their determina-

---

1. This issue does not concern the need of the plaintiffs to exhaust their *intra–union* remedies. There is apparently no question that the plain-tiffs' numerous complaints and requests for a new election were sufficient to exhaust the intra–union remedies that were available.

tion to preserve the election's result by taking steps to modify the contract the very next day. One of the plaintiffs was told not to raise the issue at the next union meeting. When an "investigation" was undertaken, it was conducted by the very person who had perpetrated virtually all of the alleged procedural irregularities. "Under these circumstances, the *attempt* to exhaust contractual remedies, required under *Maddox*, is easily satisfied by [plaintiffs'] repeated complaints to company and union officials and no time–consuming formalities should be demanded of them." *Glover v. St. Louis–San Francisco Railway Co., supra*, 393 U.S. at 331, 89 S.Ct. at 552 [emphasis in original].[2]

The futility of pursuing contract remedies under circumstances strikingly similar to the case at bar was noted by the Court of Appeals for the Seventh Circuit in *Battle v. Clark Equipment Co.*, 579 F.2d 1338 (CA 7, 1978):

> Any pursuit of these claims through the grievance apparatus would necessarily involve proof of wrongdoing on the part of the union. This leads to the anomalous result that, because of the union's indispensable role in shepherding a grievance through the various levels of the grievance machinery [,] a successful prosecution of the [employees'] grievances would depend on the union aggressively proving its own misconduct. Even if the [employees] had been able to convince a UAW review board that they had been unfairly represented by the local union leaders,

any prosecution of the [employees'] grievances against the company would still require proof of union misconduct, with the possibility of a cross–claim or subsequent suit by the company against the union for indemnification or contribution. We do not believe the law of the exhaustion of contract remedies requires the [employees] to place themselves in such a position. Because of the obvious conflict of interest between the union and the [employees] with regard to a vigorous assertion of the [employees'] grievances, a basic assumption underlying the contract provisions setting up the grievance machinery has been violated.

*Id.* at 1345–46 [footnotes omitted]. This case, like *Battle*, is therefore one in which "the individual employee may obtain judicial review of his breach–of–contract claim despite his failure to secure relief through the contractual remedial procedures." *Vaca v. Sipes*, 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).[3]

**■** *2. The duty of fair representation.* The Court of Appeals for the Sixth Circuit has adopted the three part description of a union's duty of fair representation originally put forth in *Griffin v. International Union of United Automobile Workers*, 469 F.2d 181 (CA 4, 1974):

> A union must conform its behavior to each of these three separate standards. First, it must treat all factions and segments of its membership without hostility

**2.** The nature of the dispute over the election was such that it made no sense for any single employee to file a grievance in his own behalf. Once the initial complaints were made to the Union and the evidence of obvious irregularities uncovered, the *Union* should have filed the grievance on behalf of all the employees. Its failure to do so is understandable, but it flows from the original breach of duty in conducting the election. Thus, if it were necessary, the Court would no doubt hold that the Union breached its duty to the employees in "processing" the grievance within the meaning of *Hines v. Anchor Motor Freight*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).

**3.** The defendant Company argues that even if the first step of the grievance procedure would

have been wasted, there is "*no evidence* that taking the second step–presentation to the Columbus City Joint Committee, a body composed of half Union and half Employer representatives from all over the City–would have been futile." Post–Trial Memorandum of Defendant Consolidated Freightways, at 10. To the contrary, however, there was ample evidence from which it can reasonably be inferred that the Union and the Company would have presented a united front in opposition to these plaintiffs. Presentation of a dispute on which the Company and the Union agree to a body composed solely of Company and Union representatives with no impartial decision–maker would have been quixotic at best.

or discrimination. Next, the broad discretion of the union in asserting the rights of its individual members must be exercised in complete good faith and honesty. Finally, the union must avoid arbitrary conduct. Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action.

*Id.* at 183, *quoted in Ruzicka v. General Motors Corporation,* 523 F.2d 306, 309–10 (CA 6, 1975). In *Ruzicka,* the Court of Appeals found a breach of the "arbitrariness" component of the duty when the union inexplicably neglected to process an employee's grievance to the next stage in the contract process. It has thus been established by the Courts and by the National Labor Relations Board, *see, e. g., Truck Drivers Local 315* (Rhodes & Jamieson, Ltd.), 217 N.L.R.B. No. 95 (1975), that arbitrary conduct on the part of a union in the assertion of its members' contractual rights constitutes a breach of the duty of fair representation.

In this case, the Union had the responsibility to administer a crucially important contractual right—the right to ratify implementation of the flexible work–week in accordance with the Guidelines. It was incumbent on the Union officials to conduct an election which would permit a reasonably informed vote with safeguards adequate to ensure the accuracy and legitimacy of the result. Based upon all the circumstances, the Court concludes that the Union's conduct of the election of March 9, 1978 was so deficient that the employees were deprived of their contractual right to cast a meaningful ballot in favor of or against the flexible work–week.

The employees had no notice prior to March 7, 1978 that the election was even scheduled. The great majority of the employees had no notice until March 9, 1978, approximately one hour before the vote was taken. Most, if not all, of the employees were under the impression, due to the March 7 notice, that no vote would be taken until a discussion by the employees was had on March 22. This was an important issue, and up until March 9 the employees had only been exposed to the issue from the Company's point of view in the sessions with Mr. Kelly. The Court is not critical of Mr. Kelly's vigorous advocacy of the flexible work–week, but both he and Mr. Linville should have realized that an unannounced election before the employees could discuss the issue for themselves provided insufficient notice for a reasonably informed vote. There is no rational explanation for the lack of notice. There was no definite time constraint facing the Union. The Court is disinclined to hold that the employees' voting rights may be sacrificed to suit the travel plans of Mr. Linville.

Nor is any explanation offered for the failure of the Union to give notice of the election to plainly affected employees who were absent on March 9 due to illness or personal leave. No attempt was made to notify them and no opportunity to vote was ever given them. This failure cannot be considered harmless when the margin of the election was one vote, and included a disputed ballot.[4]

The position of both defendants appears to be that the vote was nonetheless informed because the proposal was presented and questions answered at the pre–election "discussion." This discussion was heated and disorganized and the Court is of the opinion that it did not provide an adequate opportunity to reflect upon the merits of the proposal. The questions asked centered

---

4. The Court notes that Article 7(1)(B) of the Guidelines literally requires that 51 percent of all employees affected by the proposal must vote in favor. Since sixty–two employees were "affected" it could be argued that an election in which less than thirty–two employees voted "Yes" would be insufficient to ratify the proposal. The Court need not, and therefore will not, decide whether the contract must be so interpreted, since that is a question more properly resolved privately by contractually established procedures. The Court need not find that the flexible work–week would have been defeated to hold that the employees were denied their right to a meaningful vote.

as much on the inadequacy of notice as on the merits of the flexible work–week.[5]

Given these facts, it is noteworthy that the ballots distributed simply read "Yes" and "No." The employees were not given a written copy of the Guidelines or other written description of the proposal at the discussion or during the vote. The Court therefore concludes that the vote of March 9 did not permit the employees to make a reasonably informed choice with respect to the flexible work–week.

Other evidence of the haphazard nature of the election exists in the counting of the ballots. A grossly simple addition error made the result impossible given the number of absent employees, but this error was neither avoided nor discovered until over a month later. It was also apparent that the total number of ballots did not comport with the number of names on the sign–in sheet.[6]

A court's decision that the union's voting procedures were so inadequate and arbitrary as to deprive the employees of the meaningful exercise of their contractual right to ratify contract changes will depend upon the circumstances of each case. While no one failure may be dispositive, the combination in this case of the inadequate notice, the exclusion of absent employees, the refusal to allow some objections and comments at the pre–ballot "discussion," the inadequate sign–in procedure, and the use of a disputed ballot in a 29–28 election demonstrates that the Union acted arbitrarily in its administration of the employees' ratification rights under the contract. Such arbitrary conduct violates the duty of fair representation. *Ruzicka v. General Motors Corp., supra,* 523 F.2d at 309–10.

■ 3. *Breach of contract.* The Court next considers the claim that the Company's implementation of the flexible work–week was a breach of the collective bargaining agreement because there had been no proper ratification as required by Article 7(1)(B) of the Guidelines. The Company responds that it was entitled to rely in good faith on the representation of the Union made the night of the election and the following day that the flexible work–week had been approved by a vote of 31–28. Even if the Union violated the duty of fair representation, it is argued, the Company cannot be held accountable for the Union's transgression.

In the case of *Battle v. Clark Equipment, supra,* 579 F.2d 1338 (CA 7, 1978), the Court observed that

[i]n the instant case, the agreements between the union and the company regarding the modification of the SUB plan provided that the union would notify the company when the amendments had been ratified by the required numbers of employees. The company was entitled to rely in good faith on the union's representations that the amendment agreement had been properly ratified without investigating whether the January 5 meeting had been fairly run by the union and whether the subsequent ratification signatures were all obtained without fraud or misrepresentations. These were more matters of internal union concern. There is no indication in the record that the company's reliance was not in good faith.

**5.** The Court is unimpressed with the suggestion of the Union that the notice of the election was appropriate and that the employees somehow waived any objection because no person made a formal motion for a postponement, or to vote on whether to vote. The Union's duty fairly to represent its members is not relieved by a given employee's failure to assert his or her rights when the Union finds it most convenient.

**6.** The Court need not decide, given its conclusion concerning the other irregularities, whether Keith High should have been denied permission to vote because he was not a member in good standing of the Union. The Court notes, however, that the right to vote was conferred by the contract on all employees affected by the flexible work–week. Keith High clearly was so affected, and there is no indication in the Guidelines that the word "employees" was limited to Union members. The Union aptly notes its duty to represent all members of the bargaining unit, whether Union members or not.

*Id.* at 1349 [footnote omitted]. The Court would agree that when a collective bargaining agreement grants a ratification right to employees, but places upon the Union the responsibility to conduct the election, a Company does not breach the contract by accepting and relying in good faith upon the union's report of the election result.[7] The Court does not agree, however, with the defendant Company's claim that "[t]he Company took no part in the ratification vote. It was handled entirely by the Union." Post–Trial Memorandum at 12.

The Court may assume that the Guidelines place upon the Union the *exclusive* obligation to conduct an election on the proposal for the flexible work–week. It is nonetheless true that the Company's terminal manager, Mr. Kelly, was in fact "totally involved" (to use his phrase) with the ratification process. Because he had conducted his own discussions of the proposal and because he knew that the employees were being misled by the notice posted concerning the March 22 union meeting, he was aware of facts which demonstrated that an unannounced election on March 9 gave the employees insufficient notice. Despite this knowledge, he urged that the election be held on March 9, he provided facilities on Company property, he permitted the election to take place during work hours, he directed his secretary to type the ballots (which had no description of the proposal), he distributed the ballots and he helped count them. These facts were established by Mr. Kelly's own uncontested testimony, and they plainly refute any claim that the election was handled "entirely" by the Union.

The Court therefore concludes that the full knowledge of the Company's terminal manager that a meaningful vote had not been held, and his participation in some of the irregularities which denied the employees their voting rights constitute "independent wrongdoing," and prevent the Company from prevailing under the rule of *Battle v. Clark Equipment, supra,* 579 F.2d at 1349–50. Acquiescence in and acceptance of the election's result with full knowledge of facts showing that the employees' contractual right had been denied is not "good faith" reliance within the meaning of *Battle.* The Company's subsequent implementation of the flexible work–week, charged as it was with Mr. Kelly's knowledge that the requirements of the Guidelines had not been met, was therefore a violation of Article 61, § 1 of the collective bargaining agreement.

### C. Attorney Fees.

■ The plaintiffs in this action, by vindicating their own rights to participate in a meaningful ratification of the flexible work–week, have conferred a direct benefit on all Consolidated Freightways employees affected by the flexible work–week and an indirect benefit on all other members of Local 413. The existence of such a "common benefit" has been held to permit an award of attorney fees either against the beneficiary class or against the defendant responsible for the injury where an award against the beneficiary class would be inappropriate. *See Holodnak v. Avco Corp.,* 381 F.Supp. 191, 206 (D.Conn.1974), *modified on other grounds,* 514 F.2d 285 (CA 2), *cert. denied,* 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975); *Jordan v. Fusari,* 422 F.Supp. 1179, 1182–83 (D.Conn.1975). The Supreme Court has described awards of such fees as "assertions of inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress ...." *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975).

The Court also may apportion the liability for such fees among the defendants in a § 301 action such as this. *Holodnak v. Avco Corp., supra,* 381 F.Supp. at 206. In a dis-

---

7. The Court is persuaded that this is a correct statement of the law even though it exceeds the holding of *Battle,* which only considered whether an employer could be held liable for "retroactive monetary relief" if it relied in good faith on the union's report of election results. 579 F.2d at 1350. The Court noted that "[a] different result might be obtained if the appellants were seeking purely prospective or declaratory relief ...." *Id.* at 1350.

charge case, such as *Holodnak*, the employer is usually chiefly responsible for the original injury which ultimately necessitated the § 301 suit in federal court. Here, however, the Union was chiefly responsible for the original denial of the voting rights (although the Company has been held liable for its complicity), and the Union further made this litigation unavoidable by turning a virtually deaf ear to the plaintiffs' subsequent objections to the election. Under the circumstances, the Court determines that the defendant Union should be entirely responsible for the payment of the plaintiffs' reasonable attorney fees.

Counsel for the plaintiffs is directed to submit to the Court on or before June 1, 1980 a motion supported by detailed affidavits for a reasonable fee for the hours reasonably expended in the conduct of this suit. The defendant Union shall file its response on or before June 10, 1980.

*D. Injunctive Relief.*

The plaintiffs do not seek money damages from the Union or the Company for their loss of contract rights. They seek instead an order setting aside the election result of March 9, 1978, reinstating the non–flexible work–week and establishing procedural guidelines for the conduct of a meaningful election. The Court is, of course, empowered to grant mandatory injunctive relief in a case such as this. *E. g., deArroyo v. Sindicato de Trabajadores Packinghouse, AFL–CIO*, 425 F.2d 281, 291 (CA 1, 1970); *Central of Georgia Railway v. Jones*, 229 F.2d 648 (CA 5), *cert. denied*, 352 U.S. 848, 77 S.Ct. 32, 1 L.Ed.2d 59 (1956).

In forming such a mandatory equitable decree, however, the Court must consider the facts as they have been shown to exist presently, and not simply as they existed at the time the instant suit was filed. The flexible work–week has been in operation at Consolidated Freightways for nearly two years. While the Court is little moved by the Company's reliance on its breach of contract, it was nonetheless undisputed that at least twenty new *employees* have been hired, whose jobs were made possible by the flexible work–week.

In light of these facts, the Court does not deem it equitable to order immediate cessation of the flexible work–week or to order a ratification vote by only those employees who worked at the Company on March 9, 1978. The Court is of the opinion that the most effective and equitable injunctive relief would be to order an election on the issue of whether the flexible work–week should be *retained*, or whether the Company should return to a Monday–or–Tuesday–only starting date for the employees' work–week. *All* employees, including those hired subsequent to March 9, 1978 shall be permitted to vote if they are "affected" by the change within the meaning of Article 7(1)(B) of the Guidelines.

As to voting procedures, the Court does not deem it appropriate to delve so deeply into the Union's relationship with its members as to declare the procedural minima for a fair election. The Court does, however, believe that, given the nature of this issue, a minimum of two weeks notice of the election date should be mailed to the home address of each affected employee. Otherwise, the Court has no reason to doubt that the Union will employ procedures sufficient to ensure a reasonably informed and accurately tabulated vote.

*Conclusions of Law*

The Court has jurisdiction of this matter under 29 U.S.C. § 185(a).

The defendant Company and the defendant Union are, respectively, an "employer" and a "labor organization" within the meaning of the Act.

The Union breached its duty of fair representation to the plaintiffs by denying them their contractual right to cast a meaningful vote in favor of or against implementation of the flexible work–week.

The Company breached the collective bargaining agreement by implementing the flexible work–week when it had participated in conduct causing the ratification election to be meaningless, and when it was aware that a meaningful ratification, as

required by Article 7(1)(B) of the Guidelines and Article 61 § 1 of the collective bargaining agreement, had not taken place.

The attempt by the plaintiffs to pursue private resolution of this dispute was futile, and any further attempt to exhaust formal contractual remedial procedures would have been futile.

WHEREUPON, IT IS HEREBY ORDERED THAT the defendant Union shall conduct a meaningful election among *all* present employees of Consolidated Freightways in Columbus affected by the flexible work–week as to whether the Company should retain the flexible work–week or return to the former work–week which may begin only on Monday or Tuesday, as it existed prior to July of 1978. The election shall be held no later than ninety days from the date of final judgment in this action, and the Union shall mail notice of the election date to all affected employees at their home address at least two weeks prior thereto.

IT IS FURTHER ORDERED THAT the defendant Company shall, if a majority of the affected employees so vote, abandon the flexible work–week and return to the work–week which existed prior to July of 1978, which work–week shall continue at least for the life of the collective bargaining agreement presently in force.

No final judgment shall be entered until the Court has determined the amount of attorney fees to be awarded.

IT IS SO ORDERED.