828 F.2d 19
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Robert KNICKLE, Al Rosvanis, Ernie McElroy, Keith Dodds,
Varian McCullough, Allan McCullough, et al.,
Plaintiffs-Appellants,
v.
B. F. GOODRICH COMPANY, United Rubber, Cork, Linoleum &
Plastic Workers of America Local #241, United Rubber, Cork,
Linoleum & Plastic Workers of America, International Union,
Stratoflex, Inc., Defendants-Appellees.
 No. 86-3161
 United States Court of Appeals, Sixth Circuit.
 September 3, 1987.
 
 Before MILBURN and RYAN, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiffs Robert Knickle, et al., appeal from the summary judgment granted by the district court on their hybrid section 301 and ERISA claims. For the reasons that follow, we affirm.
 
 I.
 
 2
 Plaintiffs were employees of the B. F. Goodrich Company ('BFG)' at its Marion, Ohio, facility. They were represented by Local 241 of the United Rubber, Cork, Linoleum & Plastic Workers of America ('union or URW').
 
 
 3
 In April 1982, the union and BFG entered into a collective bargaining agreement that provided certain benefits in the event of a plant closing. Specifically, the agreement required BFG to:
 
 
 4
 (1) provide written notice of its intent to close the plant six months in advance of the closure date;
 
 
 5
 (2) continue health benefits for up to two years following plant closure;
 
 
 6
 (3) provide pensions to employees with twenty-five years of service regardless of age and to provide pensions to employees who were fifty-five years of age and had five years of service ('Pension upon Plant Closing');
 
 
 7
 (4) provide a 'Deferred Vested Pension' to employees whose employment is terminated after ten years of service but before they reach age sixty-five or become eligible for any other service-based pension plan.
 
 
 8
 During the course of negotiations leading up to the execution of the April 1982 agreement, union officials were told that BFG considered the Marion plant to be economically distressed. In August 1982, BFG and the union entered into a concession agreement for the stated purpose of improving the 'efficiency, economic viability, and competitive posture' of the Marion facility. The union made certain wage and cost-of-living concessions, and the parties agreed that, in the event of a plant closure, benefits would be based upon preconcession wages. BFG refused to guarantee that no closure would occur prior to the expiration of the agreement.
 
 
 9
 In February 1983, the possibility of plant closure was forewarned.[1] Thereafter, the union entered into separate but parallel negotiations with BFG and Stratoflex, an entity desiring to purchase the facility. These negotations culminated in the preparation of two agreements--a contract with BFG governing the transition of operations ('transition agreement') and a collective bargaining agreement with Stratoflex ('Stratoflex agreement'). BFG and Stratoflex insisted that the agreements be accepted or rejected as a package.
 
 
 10
 The transition agreement allowed employees who were fifty-five years of age and had five years of service, or who had twenty-five years of service regardless of age, to choose immediate retirement or to continue work for Stratoflex and defer retirement. Employees not old enough to avail themselves of this option could choose between a lump sum severance payment or continued work with Stratoflex and deferral of pension benefits.
 
 
 11
 The agreement did not contain a third option allowing employees to retain vested pension benefits while refusing to work for Stratoflex. The parties did not contest that it was common knowledge that this third option was available and was in fact required by ERISA. The contracts also provided that the plant closure provisions would not be applied to the sale to Stratoflex.
 
 
 12
 The contracts were presented to the Local membership at the June 1983 meeting. Notice was given in accordance with the union constitution. There is conflicting evidence regarding the amount of information made available to union membership before the June meeting. In his affidavit, Carl Boger stated that International president Milan Stone and Local president Tom Rose refused to speak with him during the course of the contract negotiations. Margaret Jaynes and Robert Knickle also stated that they were unsuccessful in their attempts to contact Rose. Rose, on the other hand, stated that he was available and did meet with union members in May and June of 1983. Joint Appendix at 156.[2]
 
 
 13
 The events surrounding the June 1983 ratification meeting are contested. Plaintiffs complain that the meeting hall was hot and smoky and that some people left without voting. Donald Guseman stated that the conditions in the hall 'made realistic communication very difficult at the meeting.' Joint Appendix at 182. Tom Rose stated, and plaintiffs do not contest, that this location was customarily used by the Local for ratification meetings.
 
 
 14
 There is also some conflict regarding the amount of information available to union members on the night of the vote. Boger testified that they only received outlines of the agreements. Joint Appendix at 224-25, 231. Although Boger testified that he was able to ask questions at the meeting, see Joint Appendix at 235, he stated in his affidavit that he and other members attempted to ask questions but were ruled out of order. Joint Appendix at 164. Rose testified that members were given written information about the agreements and that both were read to union membership, as was customary. Joint Appendix at 306-11. He stated that no union member asked to read the Stratoflex agreement in full. Joint Appendix at 306-07. Five copies of a partial agreement were available two weeks before the meeting, but no one had asked to see them.
 
 
 15
 During the course of the June meeting, motions were made to sever voting on the two agreements. The motions were ruled out of order. Rose stated that no objection was made. Boger, Gamble, Jaynes, Knickle and Thieken all stated in virtually identical affidavits that objections to the ruling were made. However, the record reveals no attempt to take an appeal to the International president.
 
 
 16
 There was also some confusion regarding voter eligibility. Tom Rose prepared a list of eligible voters and had it proofread and cross-checked against financial records three times. The necessary records were brought to the meeting, and no one asked to check them. Thomas Rish, who stated 'that he was a known 'No' vote on the proposed agreement,' was denied a vote. He claims that he was eligible; union officials maintain that he was not eligible to vote.
 
 
 17
 At the ratification meeting, Tom Rose told the union members he believed that the contracts represented management's last, best offer and that a plant closure was likely if the agreement was not ratified. Plaintiffs stated that union officials presented the agreements on a 'take it or leave it' basis.
 
 
 18
 In the end, both agreements were ratified by a vote of 105 to 82. Plaintiffs subsequently filed a complaint in the United States District Court for the Northern District of Ohio, alleging that the union breached its duty of fair representation, that BFG breached the collective bargaining agreement, and that the transition agreement violated ERISA.[3] Pendent state law claims of fraud and deceit were also alleged.
 
 
 19
 On August 9, 1983, a hearing was held on plaintiffs' motion for a preliminary injunction. The motion was denied on August 31, 1983. Defendants filed a motion for summary judgment on January 28, 1985. Plaintiffs responded on February 22, 1985, and defendants' motion was granted on January 31, 1986. In this appeal, plaintiffs argue that the presence of genuine issues of material fact precludes entry of summary judgment.[4]
 
 II.
 A.
 
 20
 As an initial matter, plaintiffs argue that the district court improperly allocated the parties' respective burdens under Rule 56, Federal Rules of Civil Procedure. We disagree.
 
 
 21
 At the summary judgment stage of a lawsuit the moving parties have the burden of showing conclusively that no genuine issue of material fact exists . . .. To determine whether [the moving party has] met this burden the district court must evaluate the evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party . . ..
 
 
 22
 Lenz v. Erdmann Corp., 773 F.2d 62, 63-64 (6th Cir. 1985) (per curiam). In reviewing the record, the trial court must strictly construe the submissions of the moving party. However, the submissions of the nonmoving party must be liberally construed. See, e.g., Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert. dismissed, 444 U.S. 986 (1979). The same analysis governs appellate review of a trial court's disposition of a summary judgment motion. Hand v. Dayton-Hudson, 775 F.2d 757, 759 (6th Cir. 1985).
 
 
 23
 Not every factual dispute will preclude entry of summary judgment. 'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.' Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986).
 
 
 24
 Moreover, the issue of material fact must be genuine. '[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' Id.
 
 
 25
 Our review of the district court's opinion indicates that the district court understood the proper analysis under Rule 56. The court specifically noted that the nonmoving party has no burden until 'the movant demonstrates that he is entitled to a judgment as a matter of law.' District Court Opinion at 3. In short, we believe the district court set forth the proper analytical framework. We must now determine whether this analysis was properly applied to the facts of this case.
 
 B.
 
 26
 Plaintiffs present two claims against the union for breach of the duty of fair representation. First, they argue that the union's agreement to initial wage concessions in August 1982 constituted a breach of duty. Second, they argue that the union's conduct during the negotiation and ratification of the transition agreement and the Stratoflex agreement constituted a breach of duty.
 
 
 27
 The district court held that the first claim was barred by the six-month statute of limitations contained in section 10(b) of the National Labor Relations Act and made applicable to hybrid section 301 actions by the Supreme Court's decision in DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151 (1983). This court has held that DelCostello is to be retroactively applied. Smith v. General Motors Corp., 747 F.2d 372 (6th Cir. 1984) (en banc).
 
 
 28
 The statute of limitations begins to run 'when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation.' Shapiro v. Cook United, Inc., 762 F.2d 49, 51 (6th Cir. 1985) (per curiam). See also Metz v. Tootsie Roll Industries, Inc., 715 F.2d 299, 304 (7th Cir. 1983), cert. denied, 464 U.S. 1070 (1984). In the present case, the wage concessions were negotiated in August 1982, and the complaint was filed on July 21, 1983. We agree with the district court that the action was filed well beyond the six-month limitations period. We therefore affirm the district court's conclusion that the claim based upon the 1982 concessions agreement is time-barred.[5]
 
 
 29
 Plaintiffs also allege that the union breached its duty during the course of negotiation and ratification of the transition agreement and the Stratoflex agreement. During the course of contract negotiations, the union has a duty to represent its members in a manner that is not arbitrary, perfunctory, discriminatory, or undertaken in bad faith. See Vaca v. Sipes, 386 U.S. 171, 190 (1967); Farmer v. ARA Services, Inc., 660 F.2d 1096, 1103-04 (6th Cir. 1981). Nevertheless, the union is afforded broad discretion in the negotiation process.
 
 
 30
 The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents . . .. Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.
 
 
 31
 Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953). See also Humphrey v. Moore, 375 U.S. 335, 342 (1964); Anderson v. Ideal Basic Industries, 804 F.2d 950, 952 (6th Cir. 1986); Shamblin v. General Motors Corp., 743 F.2d 436, 438 (6th Cir. 1984). The importance of the freedom to exercise broad discretion has been recognized when concessions are negotiated in order to avoid a plant closing. See Anderson, 804 F.2d 406, 412 (4th Cir. 1983), cert. denied, 467 U.S. 1205 (1984).
 
 
 32
 Closely related to the union's duty to fairly represent its members in the negotiation process is the duty to conduct ratification procedures in a manner permitting the exercise of a reasonably informed vote. The scope of this duty was considered in Parker v. Local 413, International Brotherhood of Teamsters, 501 F. Supp. 440 (S.D. Ohio 1980), aff'd mem., 657 F.2d 269 (6th Cir. 1981) (table), and Abbington v. Dayton Malleable, Inc., 561 F. Supp. 1290 (S.D. Ohio 1983), aff'd mem., 738 F.2d 438 (6th Cir. 1984) (table).
 
 
 33
 In Parker, plaintiffs alleged that their union violated its duty of fair representation during the course of ratification procedures concerning an amendment to the collective bargaining agreement. The amendment proposed implementation of a flexible work week provision that would substantially decrease overtime payments.
 
 
 34
 Most of the employees received notification of the ratification meeting only one hour before it was held. Only the employer's opinion regarding the desirability of the amendment was presented to the employees. Union members protesting the inadequacy of the notice and the substance of the amendment were told to 'shut up.' The voting procedure was riddled with irregularities and the margin of victory was at best three votes. Under these circumstances, the court concluded that a breach of the duty of fair representation had been established:
 
 
 35
 In this case, the Union had the responsibility to administer a crucially important contractual right--the right to ratify implementation of the flexible work-week in accordance with the Guidelines. It was incumbent on the Union officials to conduct an election which would permit a reasonably informed vote with safeguards adequate to ensure the accuracy and legitimacy of the result. Based upon all the circumstances, the Court concludes that the Union's conduct of the election of March 9, 1978 was so deficient that the employees were deprived of their contractual right to cast a meaningful ballot in favor of or against the flexible work-week.
 
 
 36
 501 F. Supp. at 448.
 
 
 37
 Parker was distinguished by the court in Abbington, 561 F. Supp. at 1303 n.33. In Abbington, plaintiffs argued that the union breached its duty of fair representation by meeting secretly with management during the negotiation of amendments to the collective bargaining agreement and by failing to afford membership an opportunity to cast a meaningful vote.
 
 
 38
 The court rejected the plaintiffs' argument that participation in secret meetings constituted a breach of duty. Id. at 1300. Moreover, the court concluded that no breach of duty occurred during the ratification process. Union membership was given adequate notice of the meeting. Although union officials provided no written explanation of the amendments, they were explained at the meeting. Debate on the amendments was emotional, but organized. There were no irregularities in the voting procedure, and the margin of victory was large.
 
 
 39
 The court concluded that the record contained no facts to support the allegation that the union acted arbitrarily or in bad faith. Accordingly, the union's motion for summary judgment was granted, and the judgment of the district court was upheld by this court on appeal.
 
 
 40
 We conclude that the facts of the present case present a close analogy to those in Abbington. In the present case, the union's decision to negotiate in secret until a final agreement was in place was not arbitrary or perfunctory. Union members were presented with written summaries of the agreements and they were discussed at the meeting.[6] Although plaintiffs allege that one arguably eligible voter was denied an opportunity to vote, that single vote would not have affected the outcome.
 
 
 41
 We agree with the district court that, on this record, no genuine issue of material fact exists, and the union is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Accordingly, the summary judgment granted in favor of the union is affirmed.
 
 C.
 
 42
 Our disposition of plaintiffs' claim for breach of the duty of fair representation dictates our disposition of the breach of contract claim against defendant BFG. In a hybrid section 301 action, 'to recover against either the Company or the Union, [plaintiffs] must show that the Company breached the Agreement and that the Union breached its duty of fair representation . . .. Unless [plaintiffs] demonstrate[ ] both violations, [they] can not succeed against either party.' Bagsby v. Lewis Brothers, Inc., 820 F.2d 799, 801 (6th Cir. 1987) (citations omitted, emphasis in original). Accordingly, summary disposition of the contractual claim against BFG was appropriate.
 
 D.
 
 43
 Finally, plaintiffs allege that BFG was guilty of fraud during the negotiation of the August 1982 concessions agreement. This issue was not briefed in the district court, nor has it been briefed in these proceedings. Plaintiffs make only a blanket statement that 'the argument is made that those allegations under state law for fraud and misrepresentation. [sic] The issue is whether damages under state law can be awarded. It is respectfully submitted that a determination relative to this issue should be made at the appropriate time during the course of trial proceedings.' Brief at 34.
 
 
 44
 We are skeptical that this sweeping statement is sufficient to preserve this issue for appellate review. See Lewis Refringeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co., 709 F.2d 427, 431 n.3 (6th Cir. 1983) (boilerplate language in brief insufficient to preserve issue for appellate review); cf. Rule 9(b), Fed. R. Civ. P. (allegations of fraud must be stated with particularity). In any event, we conclude that this claim is preempted by the NLRA. See Serrano v. Jones & Laughlin Steel Co., 790 F.2d 1279, 1286-87 (6th Cir. 1986).
 
 III.
 
 45
 Accordingly, for the reasons stated, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Plaintiffs argue that the union conducted itself in bad faith because it agreed to concessions in the absence of a threat of plant closure. Yet it is plaintiffs who made the allegation that, in February 1983, BFG announced its intention to close the plant. Amended Complaint p10
 
 
 [2]
 During the April union meeting, some members apparently sought to gain an opportunity for extended study of the new agreements by moving that any proposed agreement with a successor corporation be made available to union membership three days before a ratification meeting. Joint Appendix at 176. The motion was ruled out of order, and apparently no appeal was taken from that ruling
 
 
 [3]
 On appeal defendants do not argue that plaintiffs' failure to exhaust internal or contractual remedies precludes our consideration of these issues
 
 
 [4]
 The ERISA claim has been abandoned on appeal
 
 
 [5]
 The record contains no support for plaintiff's argument that the union engaged in a continuous course of unlawful conduct beginning with negotiation of the concessions agreement and culminating in ratification of the transition agreement and the Stratoflex agreement
 
 
 [6]
 Plaintiffs argue that the agreements read at the meeting were incomplete. Examination of the relevant portions of the record indicates that the information was missing from an earlier draft of the agreement, and not from the agreement read to union membership at the ratification meeting. Transcript of proceedings held on August 9, 1983, at 99-103