Herman WALKER, Bradley Coleswor-
thy, Tera B. Slaughter and Thomas
Dillon, Plaintiffs,

v.

TEAMSTERS LOCAL 71, Consolidated
Freightways, Inc., Transcon Inc., PIE
Nationwide, Defendants.

No. C–C–86–462–M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

May 8, 1989.

Edward G. Connette, Gillespie, Lesesne & Connette, Charlotte, N.C., for plaintiffs.

Hugh J. Beins, Beins, Axelrod & Osborne, Washington, D.C., Francis M. Fletcher, Jr., Harkey, Fletcher & Lambeth, Steele B. Windle, III, Miller, Johnston, Taylor & Allison, Charlotte, N.C., Melvin R. Manning, F. William Kirby, Jr., Manning, Davis and Kirby, Richmond, Va., for defendants.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

McMILLAN, District Judge.

TABLE OF CONTENTS
I. PROCEDURAL BACKGROUND ........................................ 180
II. FINDINGS OF FACT ............................................... 180
  A. Parties ..................................................... 180
  B. The Teamsters International Constitution ............................. 181
  C. The NMFA and the Carolina Supplement............................ 181
  D. Sequence of Events ............................................ 183
  E. Statute of Limitations ......................................... 185
    1. When the Statute of Limitations Began to Run.................... 185
    2. Tolling of the Limitations Period................................ 185
  F. Arbitrability of Article 52, Section 3 ............................... 185
  G. The Substantive Claims.......................................... 186
III. CONCLUSIONS OF LAW ............................................ 187
  A. Statute of Limitations ......................................... 187
    1. When the Statute of Limitations Began to Run.................... 187
    2. Tolling of the Limitations Period................................ 188

B.  Exhaustion of Internal Union Remedies ............................... 189
C.  "Arbitrability" of the Contract Provision ........................... 189
D.  The Duty of Fair Representation .................................... 190
E.  Breach of Contract............................................... 194

## I. PROCEDURAL BACKGROUND

1. Plaintiffs brought this action alleging: (1) violations of the Labor–Management Reporting and Disclosure Act, 29 U.S. C. 401 et seq.; (2) violations of Section 301 of the Labor Management Relations Act; (3) breach of contract; and (4) breach of the union's duty of fair representation. Plaintiffs seek damages for the violation of their right to vote on modifications to their collective bargaining agreement and their right to be fairly represented in contract negotiations. The heart of the controversy is allegations and evidence that the union, Teamsters Local No. 71, agreed to changes in plaintiffs' collective bargaining agreement without giving affected union members their right to vote on those modifications. Plaintiffs contend that the defendant employers joined in these modifications and breached the agreement, thus depriving the plaintiff class of wages.

2. A motion for class certification was filed by plaintiffs and was fully briefed and argued by counsel for the parties. On February 19, 1988, the court entered an order certifying a class of plaintiffs to include the following individuals:

"all over the road drivers covered by the provisions of the Carolina Supplement to the National Master Freight Agreement for the period April 1, 1985 to March 31, 1988, who were employed by Consolidated Freightways, Inc.: Transcon, Inc.: or PIE Nationwide, during the period between October 1, 1985 and May 4, 1986."

3. The case was tried on May 24, 25 and 26, 1988. The court encouraged the parties to explore settlement, agreeing to hold the case open until Monday, June 6 for that purpose. Settlement discussions failed. Post-trial briefs were submitted, and thereafter the court filed a memorandum of decision indicating that it intended to rule in plaintiffs' favor and directing their counsel to submit proposed findings of fact and conclusions of law.

4. In deciding the issues, the court has carefully considered all of the evidence bearing on each such issue, and notes that there have been conflicts in the testimony on certain points. The court made decisions involving credibility and weight to resolve those conflicts. In assessing credibility, the court took into account the usual factors, including the witnesses' demeanor, any interest or bias and the witnesses' knowledge, education and experience. Based upon review of all of the evidence presented, the court makes the findings of fact and conclusions of law set forth below.

## II. FINDINGS OF FACT

### A. Parties.

5. Plaintiffs are over-the-road truck drivers who are members of Teamsters Union Local No. 71 and employed by companies which are signatories to the National Master Freight Agreement (NMFA), a nationwide agreement that covers approximately 200,000 trucking industry employees. Plaintiffs are also covered by the terms of the Carolina Freight Council Over–the–Road Supplemental Agreement (Carolina Supplement), one of the supplemental agreements negotiated simultaneously with the NMFA, which covers all class members. Herman Walker testimony, Exhibit 30.

6. Plaintiff Herman Walker is a truck driver employed by Consolidated Freightways, Inc. He is a resident of Gaston County, North Carolina and a member of Teamsters Local 71. At the time this action was filed, he was an elected shop steward for Consolidated Freightways Road Drivers domiciled in Charlotte, North Carolina. Walker testimony.

7. Plaintiff Bradley Colesworthy is a truck driver employed by Consolidated Freightways, Inc. He is a resident of Gaston County, North Carolina and a member of Teamsters Local 71. Colesworthy testimony.

8. Plaintiff Thomas Dillon is a truck driver employed by Transcon, Inc. He is a resident of Gaston County, North Carolina and a member of Teamsters Local 71. Dillon testimony.

9. Plaintiff Tara B. Slaughter is a truck driver employed at times relevant to this action by PIE Nationwide, Inc. He is a resident of Mecklenburg County, North Carolina and a member of Teamsters Local 71. Slaughter testimony.

10. Defendants Consolidated Freightways, Inc., Transcon Inc., and PIE Nationwide, Inc. (the employer defendants) are motor common carriers with terminals in Mecklenburg County, North Carolina. They are employers within the meaning of 29 U.S.C. §§ 152(2) and 185, and they are parties to the NMFA and the Carolina Supplement. Stipulated facts, paragraphs 5–7.

11. Defendant Teamsters Local # 71 is an unincorporated labor organization with its principal office in Mecklenburg County, North Carolina. Along with the employer defendants, Local 71 is a party to the NMFA Carolina Supplement. Local 71 is a labor organization within the meaning of 29 U.S.C. §§ 152(5), 185 and 402(i). Local 71 is affiliated with the International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America ("IBT").

B. *The Teamsters International Constitution.*

12. Article XII of the Teamsters Constitution sets forth the union's requirement for contract ratification votes. These provisions require ratification prior to the signing of a new agreement *as well as* whenever mid-term modifications are made. Section 1(b) states:

Contracts may be accepted by majority vote of those members involved in negotiations and voting, or a majority of such members may direct further negotiations before a final vote on the employer's offer is taken, as directed by the local Union Executive Board.

. . . .

All of the above provisions shall apply when a contract permits a re-opener or is voluntarily reopened, during its term.
Exhibit 29, Stipulated facts, paragraph 13.

13. Article XVI, Section 4(a) of the International Brotherhood of Teamsters Constitution in effect between June 5, 1981, and May 24, 1986, provides in pertinent part:

If a majority of the votes cast by Local Union members voting approve such contract, it shall become binding and effective upon all Local Unions involved and their members.

. . . .

When a contract negotiated under the provisions of this article permits a re-opener and re-negotiation or is voluntarily re-opened during its stated term, the above shall apply to ratification of the new terms, if any, and Section 4(b) shall apply to strike votes.
Stipulated facts, para. 14.

14. The defendants know this requirement well. In several reported decisions, the Teamsters have been found to have illegally modified the Collective Bargaining Agreement without first conducting a ratification vote of the affected members. *Bauman v. Presser*, 117 LRRM 2393, 1984 WL 3255 (D.D.C.1984); *Conroy v. Teamsters Local 705*, 124 LRRM 3240, 1985 WL 2560 (N.D.Ill.1985); *Sako v. Teamsters Local 705*, 125 LRRM 2372, 1987 WL 10981, reconsideration denied, 127 LRRM 2556, 1987 WL 17843 (N.D.Ill.1987).

15. In the past, Teamsters Local 71 has invoked these constitutional provisions to require ratification votes on matters as obscure as a change in the lunch hour for loading dock workers, and seniority dispatch. Brad Colesworthy testimony.

16. The defendant union acknowledges that mid-term contract modifications require a ratification vote, according to Conrad Sides, Local 71 President. Sides deposition at 134, 135.

C. *The NMFA and the Carolina Supplement.*

17. On March 31, 1985, the NFMA and the Carolina Supplement expired. Negotia-

tion of a new contract continued after the old contract expired, and in May 1985, a tentative agreement was reached.

18. In May 1985, Conrad Sides, president of Local 71, announced the terms of the tentative agreement to the affected union members of Local 71 at a union hall meeting. Stipulated Facts 18. Dillon, Slaughter testimony.

19. At that meeting, Sides stated, "We've got some good news and some bad news. First, we finally got what you wanted—gate-to-gate mileage." Slaughter testimony. By "gate-to-gate mileage" Sides was referring to a new provision of the agreement which required the payment of drivers for the actual number of miles they drove from terminal-to-terminal.

20. After the contract meeting the agreement was submitted to the affected members for a ratification vote, and on May 17, 1985, was ratified by the membership.

21. The new NMFA and Carolina Supplement ratified in May 1985 therefore included a new provision important to road drivers. This provision, contained in Sections 2 and 3 of Article 52, is at the center of the controversy now before the court; it provides:

Article 52

. . . .

Section 2. *Mileage Determination.*

Mileage shall be computed on official AAA mileage. Where a dispute arises, it shall be filed with the Bi–State Grievance Committee. The Employer and the Union shall then jointly log the mileage from terminal to terminal, and the results reported to the Bi–State Grievance Committee. Once this mileage is established, it shall immediately be applied to all runs operated over that particular route by all Employers operating between those two points. No Employer shall change its present mileage pay until the above procedure has been followed, unless such change is agreed to by the Local Union involved. The speedometer of any measuring automobile must be calibrated prior to any measurement. Any change in mileage resulting

from the above procedure shall not result in any retroactive pay to a driver or refund from a driver.

Section 3. *Mileage adjustment.*

Within six (6) months of the effective date of this Agreement, the parties will convert the mileage from zero point to terminal by jointly checking the miles to each terminal. It is understood the parties will establish a common checkpoint outside the terminal city and determine the difference in distance between the zero point and the terminal. Once the difference is established, the mileages will be adjusted. It is further understood that any disputed over-the-road mileage between points will be determined.

Stipulated Facts, para. 23, Exhibit 30.

22. The Carolina Supplement was ratified on May 17, 1985. By stipulation of the parties, the mileage provisions at issue in this case were "non-monetary provisions" which became effective on May 27, 1985. Allowing for the six-month conversion period contained in Article 52 of the Carolina Supplement, drivers should have been paid for their travel based upon the terminal-to-terminal rates beginning December 1, 1985.

23. Thus, within six months of the effective date of the newly ratified Carolina Supplement, the employers were required to pay the drivers for the actual mileage that they drove. This is called 'terminal-to-terminal' mileage. The conversion to terminal-to-terminal mileage required recalibration of the mileages over all routes driven by class members.

24. Under the previous NMFA and Supplements, road drivers' mileage pay had been calculated by multiplying the mileage rate by established mileage figures between various cities. This is often referred to as "AAA" or "post office to post office" mileage, since the "zero mileage point" for many cities and towns is located at or near the post office. Plaintiffs contend that in almost all cases, the terminal-to-terminal mileage provisions benefit the class, because they increase by a substantial

amount the number of miles for each trip the drivers work. Exhibit 74.

25. The members of Local 71 voted for the conversion to terminal-to-terminal mileage. They believed that the companies fared better than the drivers under the post office to post office method. The inclusion of terminal-to-terminal mileage in the agreement was therefore a popular and significant proposal. Walker testimony, Sides deposition at 35, 55.

26. Plaintiff Colesworthy testified that as an extra board driver, he ran most of the various trips that Consolidated Freightways had established, and that he wanted terminal-to-terminal pay because the drivers benefitted by it. He had compared the actual miles on his hubometer with the mileages that he had been paid for, and found that he almost always drove more miles than he was paid for.

27. Plaintiff Walker testified that he had been suggesting the terminal-to-terminal mileage method to the union leaders for many years.

28. In negotiating this provision, the union intended that terminal-to-terminal mileage would be effective, and drivers would be paid on the basis of it, by December 1, 1985. Sides deposition.

29. The employer defendants assert that this contract language was ambiguous in that it did not require them to measure certain mileages prior to the calculation of terminal-to-terminal mileage. In particular, the employers assert that the language creates a distinction between 'trunk' miles, the miles between common checkpoints outside of cities driven to, and 'spur' miles, the miles between those checkpoints and each of the various terminals. The employers assert that the parties did not intend to measure trunk miles. Stip. Fact No. 27, Exh. 100.

30. The contract language does not support the employers' justifications for delay. The language of the first sentence of Section 3 unequivocally states that the mileages will be implemented within six months of the agreement's effective date. The language of the last sentence of Section 3 states that disputed trunk mileages will

also be measured, thus answering the employers' contention.

31. The history of negotiations also shows that the six-month provision was intended to be final and binding. In negotiating this provision, the members of the Carolina Negotiating Committee recognized that measurement of terminal-to-terminal mileage would be a significant and large task. Charles Williams, who later became the key union player responsible for implementing terminal-to-terminal mileage, told the negotiating committee that they would need several months to measure all the mileages and put them into effect. Charles Williams testimony.

32. Even under the old AAA mileage system, measurements had been made when mileages for different runs were disputed. In addition, whenever new runs were established, those runs were always calibrated. Charles Williams had been in charge of recalibration of disputed runs for trips under the Carolina Supplement prior to 1985. Thus, both the union and employer defendants had participated in calibration of mileages and knew the difficulty of the task that they were facing. Charles Williams testimony.

### D. Sequence of Events.

33. Even though terminal-to-terminal mileage was to be implemented within six months of the effective date of the contract, the defendants did not even meet to discuss mileage implementation until almost four months after contract ratification. On September 9, 1985, the Carolina Negotiating Committee appointed a mileage committee to calibrate the terminal-to-terminal mileage as required under Article 52. The Carolina Negotiating Committee also decided that terminal-to-terminal mileage would be implemented by December 1, 1985, stating:

[The mileage subcommittee] will submit completed mileage checks to the Bi-State Committee on November 20 *and such mileages are to be implemented by the carriers on December 1.* Mileage checks completed after November 20 will

be submitted to the Bi–State on a monthly basis.

Exhibit 13, paragraph 4; Stipulated facts, paragraph 50 (emphasis added); Herman Walker and Charles Williams testimony; Exhibit 32.

34. The only step taken toward measurement of the mileages prior to October 21, 1985, was the September 9 meeting of the Carolina Negotiating Committee. Sides deposition at 89. At that committee meeting, the company and union representatives established guidelines for the recalibration of the various runs for trucking companies in the Carolinas. In addition to the provision set forth above, the guidelines required that the union and employers rent cars to measure the mileages, and place equal numbers of union and employer representatives in each car. The guidelines provided no mechanism for speeding up the measurement process. The guidelines did not establish a mechanism for measuring the mileages nor establish how they would be measured. Those decisions were delegated to the mileage subcommittee.

35. None of the terminal-to-terminal mileages were recalibrated during the first five months of the new 1985 contract. Mileage measurements did not even begin until October 21, 1985. Exhibit 63, p. 2, Williams testimony.

36. The contract language in Article 52, Section 3 of the Carolina Supplement clearly provided that any disputed trunk mileages should be measured. Exh. 30.

37. Union representative Charles Williams realized by the time of the September 9, 1985, meeting that the mileages would not become effective until several months after the six-month deadline had elapsed. Charles Williams testimony.

38. No complete runs were measured by December 1, 1985. The committee had chosen to measure all trunk mileages first, and to wait to do spur mileage calibrations upon completion of the trunk runs. Because of that method, no mileages were completed until March, 1986. Williams testimony.

39. Time passed. None of the terminal-to-terminal mileage adjustments was implemented on the December 1, 1985, date required by the Carolina Supplement and established by the Carolina Negotiating Committee. Plaintiff Walker began asking union officials when the terminal-to-terminal mileage implementation would be completed and whether adjustments would be made retroactive to December 1. When he failed to receive satisfactory answers, he filed his first grievance on February 17, 1986, as a "class-action grievance" on behalf of all road drivers covered by the 1985–1988 Carolina Supplement. Through this grievance, he attempted to assure that terminal-to-terminal mileage would be implemented promptly and made retroactive to December 1, 1985. Exhibit 64; Herman Walker testimony.

40. Walker filed an additional grievance on February 25, 1986 addressing the same issue. Exhibit 65; Herman Walker testimony.

41. While Walker's grievances were pending, the Carolina Bi–State Grievance Committee ("Bi–State Committee") met on March 20, 1986, to consider implementation of terminal-to-terminal mileage and ruled that "the mileages are accepted as submitted and shall be effective May 4, 1986."

42. Even though Walker's grievances were pending at the time, they were not considered or discussed by the Bi–State Committee on March 20. In fact, the Bi–State Committee did not consider Walker's grievances until many months later, on September 16, 1986, at which time Walker's grievances were denied. Exhibits 63, 64 and 65; testimony of Herman Walker, Charles Williams and Robert Bell.

43. After plaintiff Walker learned that implementation of terminal-to-terminal mileage had been delayed again, he filed another grievance in May, 1986, requesting retroactive implementation of the mileage adjustment to December 1, 1985. This grievance was not heard until September 16, 1986, at which time the claim was denied. Exhibit 64, Herman Walker testimony.

44. After Walker's grievances addressing the terminal-to-terminal mileage imple-

mentation date were denied on September 16, 1986, he and other union members filed internal union charges against Local 71 for failing to pursue actively implementation of terminal-to-terminal mileage in a timely manner and failing to conduct a referendum among road drivers concerning delayed implementation. Exhibits 4, 5, and 6, Herman Walker testimony.

45. This action was filed on October 14, 1986.

### E. *Statute of Limitations.*

46. The defendants contend that plaintiffs failed to file their action within the applicable six-month statute of limitations period, which they contend began to run on March 20, 1986, the date of the Bi–State Committee decision to implement terminal-to-terminal mileage beginning May 4, 1986. For purposes of considering this defense, the court makes the findings of fact set forth below.

#### 1. When the Statute of Limitations Began to Run.

47. Following the March 20, 1986, decision to implement terminal-to-terminal mileage on May 4, 1986, local union president Conrad Sides posted a notice on April 17, 1986, informing union membership of the May 4, 1986, mileage implementation date. Exhibit 2.

48. At trial, the union called several witnesses who testified that they had learned of the March 20 Bi–State Committee decision some time between March 21, and April 17, 1988. Norris, Hagler, Bieber, Bowman testimony. Although the union defendants contend that the decision to delay implementation of terminal-to-terminal mileage was common knowledge among drivers by late March, 1986, the named plaintiffs consistently testified that they did not learn of the decision until after Conrad Sides posted his notice on April 17, 1986. Compare defendants' testimony of Hugh Baxter, Horace Scarborough and exhibits 86–90 with testimony of Herman Walker, Brad Colesworthy, Tera Slaughter and Tom Dillon, and with Exhibits 91–93.

#### 2. Tolling of the Limitations Period.

49. Plaintiffs contend that even if the limitations period began to run on March 20, 1986, or at some earlier date, any reasonable effort by the plaintiffs to exhaust remedies, however futile, tolls the statute of limitations. In considering whether the applicable limitations period was tolled, the court makes the findings of fact set forth below.

50. Plaintiffs assumed that the mileage provisions in Article 52 of the agreement would become effective in December. Although it was not implemented on that date, they thought that mileage pay under the terminal-to-terminal mileage system would be made retroactive to December 1, 1985. Walker, Colesworthy, Slaughter and Dillon testimony. They were not alone in this assumption. Conrad Sides, President of Local 71, also believed the pay would be made retroactive. Sides deposition, pp. 99–103.

51. When payment was not received in the weeks after December 1, Walker filed his first "class-action" grievance on February 17, 1986, on behalf of all drivers. Under the circumstances, this was a reasonable step by Walker, who believed that the employers had breached the agreement. The union processed this grievance, and it was accepted as timely by the employer. Exhibit 64, Walker testimony.

52. In April, Walker learned that the Bi–State Committee had decided to delay implementation of the terminal-to-terminal pay, and make payment retroactive, but only to May 4, 1986. Again, Walker filed a grievance, assuming that the Bi–State Committee had acted outside of its jurisdiction, and that their decision could be corrected, as he stated at the September 16, 1986, hearing on all of his grievances. Exhibit 64, Sides deposition, pp. 39–40.

### F. *Arbitrability of Article 52, Section 3.*

53. During the 1985 contract negotiations, Section 2 remained virtually unchanged, while Section 3 was "completely rewritten." *See* employer defendants' summary judgment brief, p. 5, testimony of

Charles Williams. Examination of the language of Section 2 reveals that it was largely superseded by Section 3.

54. Section 2 had previously stated that "Mileage shall be computed in official AAA mileage" which is based on a distance between city centers, but this system was rejected when the parties agreed to convert to the terminal-to-terminal system. More importantly, Section 2 was intended to serve solely as a device for resolving disputes between the parties over the length of individual runs. Thus, in 1986, the Bi-State Committee heard a grievance filed by plaintiff Walker over the calculation of mileage on one of Consolidated's runs. Walker deposition at 134–35; Exhibit 20. Section 2 as a whole simply provides a mechanism for remeasuring runs which the driver or union feels are inaccurate. Seen in this light, the Section 2 provisions on retroactivity are reasonable; that the employers would not be penalized for previous errors by going back and checking the runs for each drive, when only a few would stand to gain. To apply the retroactive pay provision of Article 2 to Article 3 however, makes no sense, for it gives the employers, who stand to lose money through Section 3, free rein to delay measurement of the mileage throughout the contract term.

55. In negotiating the new terminal-to-terminal provision, company and union representatives, according to Sides, spent "many, many negotiating sessions" working out the language in Section 3, and decided that they could complete the mileage checks necessary to implement the new system, and have them implemented, within six months. Sides deposition at 57–59, 99–100. According to Sides, his understanding of the agreement has always been that the payment for the new mileage would commence on December 1, and even after the employers failed to have the runs measured by that date, he expected the payment to be made retroactive to December 1, because that is what he had bargained for. Sides deposition at 99–103.

### G. The Substantive Claims.

56. The Bi-State Committee has jurisdiction to resolve "all matters pertaining to the interpretation of any provision of this agreement." Stip. Facts, para. 30, Exhibit 30, Article 44, 1985–88 Carolina Supplement. The Committee consists of equal numbers of employer and union representatives.

57. On March 20, 1986, the employers and unions under the Carolina Supplement presented a mileage report to the Bi-State Committee. The report stated that some 90% of the mileages had been measured. Sides deposition at 104, Exhibit 63.

58. In the past, the Bi-State Committee had been presented with mileage reports in order to approve the mileage figures so that all companies would be paying the same amount. Sides deposition at 64.

59. Ken Bowman, business agent for Local 71, participated in the March 20 Committee decision. The Bi-State Committee is not empowered to modify or amend the provisions of the collective bargaining agreement. The mileage report submitted did not contain any request for interpretation of the agreement, only a submission of the mileage figures. Sides deposition. Nevertheless the Committee ruled that "the mileages are accepted as submitted and shall be effective May 4, 1986." Exhibit 63.

60. The transcript of the hearing reveals that the union did not even argue that the pay for terminal-to-terminal mileage should be made retroactive to December 1, 1985. Exhibit 63.

61. Carriers who did not have the mileages completed by May 4, 1986, were required to pay retroactively to that date. Sides deposition, Exhibit 63, Charles Williams testimony.

62. During the trial, the defendants argued that the contract required only that "spur" miles be recalibrated within six months and attempted to create a distinction between spur and "trunk" miles. This contention has no support in the language of the contract and does not excuse defendants from their obligation to convert the mileage pay system by December 1, 1985.

63. The contract provision at issue states:

Article 52

. . . .

Section 3. Mileage adjustment

Within six (6) months of the effective date of this agreement, the parties will convert the mileage from zero point to terminal by jointly checking the miles to each terminal. It is understood the parties will establish a common checkpoint outside the terminal city and determine the difference in distance between the zero point and the terminal. Once the difference is established, the mileages will be adjusted. *It is further understood that any disputed over-the-road mileage between the points will also be determined.*

Exhibit 30. (emphasis added)

64. The first sentence says that conversion to terminal-to-terminal was to take place within 6 months. The following sentences establish the procedure. The last sentence makes clear that trunk miles, where disputed, were to be recalibrated as well, and that the parties anticipated this when the contract was written. Thus, the recalibration and pay change was to occur within six months.

65. Evidence offered at trial showed that the drivers had anticipated recalibration within six months. The union defendants' witnesses anticipated recalibration within six months. Indeed, according to Teamsters Local 71 president Conrad Sides, the six-month implementation provision was added after many negotiations with the companies because they knew that it could not be implemented immediately. The six-month period was drafted to give the union and company representatives time to calibrate the miles. Sides deposition pp. 57–58. Charlie Williams, a union witness, testified that he had been involved in earlier recalibrations. Based on his prior experience, he informed the Carolina Negotiating Committee that recalibration would take an enormous amount of time and work. Williams testimony.

66. Until the Carolina Negotiating Committee met on September 9, 1985, the terms

"trunk" and "spur" miles had never been used. Sides deposition, p. 176. However, the Committee elected to measure both trunk and spur miles. Moreover, it elected to measure trunk miles first. Exhibit 13; Robert Bell testimony. Defendants contend that spur miles could not be measured until trunk mile calibrations had been completed. Somehow, defendants contend that this justifies their delay in making the conversion. The court finds no merit to this argument. The relevant provisions of Article 52 of the Carolina Supplement make no distinction between spur and trunk miles in requiring conversion to terminal-to-terminal mileage within six months.

## III.   CONCLUSIONS OF LAW

### A. *Statute of Limitations.*

(Paragraph 1 of Memorandum of Decision.)

### 1. When the Statute of Limitations Began to Run.

■   1. Pursuant to *Reed v. United Transportation Union,* —— U.S. ——, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989) (January 11, 1989), the statutory claims arising under section 101(a)(1) of the Labor Management Reporting and Disclosure Act are governed by North Carolina's three-year statute of limitations for personal injury actions.

2. All parties acknowledge that the applicable statute of limitations to be applied to the statutory claims under 29 U.S.C. §§ 185 and 186 is six months. *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed. 2d 476 (1983). The dispute between the parties concerns when the statute begins to run as to these claims. Defendants contend that plaintiffs should have filed this action within six months of the Bi–State Committee decision on March 20, 1986, or at some earlier date.

3. Teamsters Local 71 has tried to show that plaintiffs should have known about the March 20 Bi–State Committee decision more than six months before this suit was filed. The union defendant has offered this evidence in an attempt to claim that

the six-month statute of limitations ran before the suit was filed. For the reasons stated below, however, this defense has no merit.

4. The credible testimony of plaintiffs shows that they did not know about the adverse action of the Bi–State Committee until Conrad Sides posted a notice of the action on April 17, 1986. Suit was filed within six months of that date.

5. Without attempting to explain why President Sides waited almost a month after the March 20 Bi–State Committee decision before posting this notice, the defendants have attempted to claim that the decision was "common knowledge" among the drivers before that date. Defendants' assertion that it was "common knowledge" and a topic of conversation among the drivers on their CB radios before the April 17 notice does not trigger the limitations period any sooner. Workplace scuttlebutt does not commence the running of the statute of limitations. For whatever reason, local union president Conrad Sides chose to wait until April 17, 1986, to announce the March 20 Bi–State Committee decision. Defendants cannot now claim that plaintiffs should be charged with knowledge of the decision at some earlier date.

2. Tolling of the Limitations Period.

6. In any event, even if defendants are correct in their assertion that the limitations period began to run on March 20, 1986, or at some earlier date, the statute was tolled by plaintiffs' attempt to exhaust internal remedies.

7. In *Clayton v. International Union, United Automobile Workers,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981), the Supreme Court held that exhaustion of internal union remedies is normally a prerequisite to a duty of fair representation suit and that the statute of limitations is tolled during that period. Thus, the six-month statute of limitations did not begin to run during the time that plaintiffs were attempting to resolve the issues in this case through their grievance procedures and internal union remedies. Here, Herman Walker's various grievances, including his February 17, 1986, "class action grievance"

were pending and were not decided until September 16, 1986. Thus, the statute of limitations period was tolled until September 16, 1986.

8. In *Frandsen v. Brotherhood of Railway, Airline & Steamship Clerks,* 782 F.2d 674 (7th Cir.1986), the court held that the six-month statute of limitations was tolled during the time when internal union remedies were being pursued. In a detailed analysis of the issue, the court noted:

*Clayton* and *DelCostello*, read together, envisage the following scheme: an employee seeking to vindicate his right to fair representation has six months from the date of his injury to file suit in federal court. At the same time, however, he must pursue internal union procedures that possibly may provide him with a remedy. Thus, during the pendency of those union procedures, the six-month statute of limitations is tolled, to commence running only when the union procedures are exhausted.

782 F.2d at 681.

9. The six-month statute of limitations is also tolled as to the employer defendants while plaintiffs were pursuing union remedies. To hold otherwise would force the plaintiffs to bring two separate lawsuits: First, against the employer within the six-month statute of limitations, and, Second, against the union, once internal union remedies were exhausted. To avoid this type of piecemeal litigation, the court in *DelCostello* settled on the statute of limitations period to avoid "establishing different limitations periods for the two halves." 462 U.S. at 169, fn. 19, 103 S.Ct. at 2293 fn. 19. Similar reasoning was followed by the court in *Frandsen* in holding that the statute of limitations is tolled as to the employer while plaintiffs pursue their union remedies.

10. In a recent decision under the analogous Railway Labor Act, the Fourth Circuit held that the statute of limitations does not begin to run until internal union remedies are exhausted:

Generally speaking, "a cause of action for breach of the duty of fair representation accrues at the point where the griev-

ance procedure has been exhausted or otherwise breaks down to the employee's disadvantage. It is only at this point that the employee is cognizant of any alleged breach of the duty owed him by the union." *Hayes v. Reynolds Metals Co.,* 769 F.2d 1520, 1522 (11th Cir.1985) (per curiam).

*Dement v. Richmond, Fredericksburg & Potomac Railroad Company,* 845 F.2d 451, 460 (4th Cir.1988).

11. Any reasonable effort by the plaintiffs to exhaust remedies, however futile, tolls the statute of limitations. *Frandsen v. Brotherhood of Railway Airline and Steamship Clerks,* 782 F.2d 674 (7th Cir. 1986). The efforts by plaintiff Walker to pursue grievance and other internal union remedies were entirely reasonable under the circumstances and tolled the limitations period until at least September 16, 1986. This suit was filed well within six months of that date. *See, e.g., Lewis v. International Brotherhood of Teamsters Local 771,* 826 F.2d 1310, 1318 (3rd Cir.1987) ("the time for suit should not begin to run until 'the futility of appeals [becomes] apparent'"), *citing, Clayton v. International Union, United Automobile Workers,* 451 U.S. 679, 685–89, 101 S.Ct. 2088, 2093–95, 68 L.Ed.2d 538 (1981). Where the employee makes a good faith attempt to rectify the contract breach, prior to suit, his actions toll the statute. *Adkins v. International Union of Electrical, Radio, and Machine Workers,* 769 F.2d 330, 336 (6th Cir.1985); *Scott v. Local 863,* 725 F.2d 226, 229 (3rd Cir.1984); *Frandsen, supra.*

B. *Exhaustion of Internal Union Remedies.*

(Paragraph 2 of Memorandum of Decision).

■ 12. At the time this suit was filed, an internal union grievance initiated by plaintiff Walker and others was pending. Walker testimony, Exhibits 6, 7. Plaintiffs were not required to exhaust this internal dispute resolution procedure before filing suit because that procedure was incapable of affording plaintiffs the relief sought. Any resolution reached between plaintiffs

and Local 71 would not have been binding on the employer. *See Warner v. McLean Trucking Co.,* 574 F.Supp. 291 (S.D.Ohio 1983).

13. While the union defendant contends that plaintiffs should have filed their action within six months of March 20, 1986, it also claims that plaintiffs failed to exhaust internal union remedies before filing suit. Ignoring the inconsistency of this position, plaintiffs are not barred from filing suit by their failure to finish out every possible internal union remedy. As the Supreme Court has noted, at some point exhaustion efforts become futile, and "the member ... [may become] ... exhausted instead of the remedies...." *NLRB v. Marine Workers Local 22,* 391 U.S. 418, 425, 88 S.Ct. 1717, 1722, 20 L.Ed.2d 706 (1968).

C. *"Arbitrability" of the Contract Provision.*

(Paragraphs 3 and 4 of Memorandum of Decision).

■ 14. The plain language of Article 52, § 3 required that the new mileage system be put into effect within six months of contract ratification, or by December 1, 1985. The drivers are entitled to receive compensation based upon the terminal-to-terminal mileage rates as of December 1, 1985, regardless of when the actual recalibrations were completed, and regardless of whether the parties consider the miles measured to be "spur" or "trunk" miles. Unless the six-month provision of Article 52 § 3 is deemed to require payment by the terminal-to-terminal method *by December 1, 1985,* the contract language is meaningless, for it would permit the employer to delay payment interminably.

15. The defendants contend that the Bi–State Committee was simply "interpreting" the Carolina Supplement and was not modifying it, when it ruled on March 20, 1986, that the new mileage rates would be implemented on May 4, 1986. They argue this in the face of clear language in Article 52, Section 3 providing that *"within six months* of the effective date of this Agreement, *the parties will convert* the mileage

from zero point to terminal by jointly checking the miles to each terminal." (Emphasis added.)

16. The action by the Bi–State Committee does not draw its essence from the contract and is not entitled to the deference typically afforded arbitration decisions.

17. Moreover, the Bi–State Committee exceeded its authority when it ruled on March 20, 1986, that implementation would be delayed until May 4, 1986. No provision of the contract gave the committee authority to extend implementation beyond the six-month deadline specifically established by the contract.

18. Where a grievance committee exceeds its authority and amends, rather than interprets an agreement, deference to the committee decision is not warranted. See *Warner v. McLean Trucking, supra.*

19. The reason the defendants have tried so hard to cast the Bi–State Committee's action as an "interpretation" of the contract is to take advantage of a recent Supreme Court decision that gives arbitral bodies wide discretion in hearing evidence, finding facts, and interpreting disputed contract provisions. In *United Paperworkers v. Misco,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), the Court held that the factual basis for an arbitrator's decision is not subject to review by federal courts absent fraud or misconduct in the arbitration process.

20. The *United Paperworkers* decision in no way altered the axiom that arbitrators can only *interpret* contracts and have no authority to *modify* them. *Warner v. McLean Trucking Company, supra; See also, Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Steelworkers v. Warrier & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

21. An arbitral body such as the Bi–State Committee has authority to interpret a contract, but the committee cannot rewrite the terms of the contract by altering express language. In this case, the six-month deadline specified by the Carolina Supplement language left no room for interpretation and no gaps to be filled by the Bi–State Committee. If mileage calibrations could not be completed and approved by the six-month deadline, then pay adjustments should have been made retroactive to the deadline. Indeed, when the Bi–State Committee made its ruling on March 20, 1986, it specified that employers that had not implemented the new mileage rates by May 4, 1986, would pay drivers retroactively to that date. Employers in fact did give retroactive pay for terminal-to-terminal mileage once it was implemented. Thus, the employers were clearly capable of calculating retroactive pay, and the Bi–State Committee recognized that retroactive pay could be required in the implementation of terminal-to-terminal mileage.

22. In summary, the defendants' efforts to justify not making pay adjustments retroactive to the six-month deadline specified by the contract simply cannot be dismissed as a mere "interpretation" of the contract. *United Paperworkers* in no way bars this court from reviewing illegal contract modifications, violation of members' right to vote on modifications, and the defendants' conduct in so acting. The Bi–State Committee was not merely "interpreting" the contract language, it was modifying its express substantive provisions without a required ratification vote by the affected union members.

D. *The Duty of Fair Representation.*

(Paragraphs 5 and 6 of Memorandum of Decision).

23. A union's duty to represent its members fairly is a judicially created doctrine, derived to balance the union's exclusive representation of its members, set forth in Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a). With this exclusive authority comes a responsibility to the individual members, whose individual bargaining rights are correspondingly limited. Under the seminal decision of *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Court described

the duty of the union "to serve the interests of all members without hostility or discrimination to any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Id.* at 177, 87 S.Ct. at 910.

24. The Fourth Circuit has held that a breach of the duty can arise from a breach of any one of the obligations outlined in *Vaca. Griffin v. International U., United Automobile, A. & A.I.W.,* 469 F.2d 181, 183 (4th Cir.1972). ("While negligence in handling grievances has not been identified as breaching the union's duty of fair representation, ... the courts have adopted the position that a union may not arbitrarily ignore a meritorious grievance or handle it in a perfunctory manner."); *see also Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888, 891 (4th Cir.1980) (to sustain a union member's action against a union for failure to provide fair representation, it is not necessary that the union's breach be intentional. "A union representative could be so indifferent to the rights of members or so grossly deficient in his conduct ... that the conduct could be equated with arbitrary action.")

25. Applied to the facts of the instant case, it is apparent that the union breached its duty of fair representation in several ways, including:

26. First, it *failed to seek timely implementation* of the provisions of the 1985 contract in a diligent fashion. Between ratification of the contract in May and the first implementation meeting four months later in September, it did nothing at all. The company and union defendants failed to produce any evidence showing reasonable steps taken by it in the first four months following ratification of the Carolina Supplement to assure that mileage conversion would occur within the prescribed six months. Throughout, the union acted arbitrarily in the face of clear contract language requiring it diligently to seek implementation of terminal-to-terminal mileage within six months. Its actions were grossly negligent toward union members' interests.

27. At the September 9 Negotiating Committee meeting and thereafter, the union *failed to raise the issue of pay* by the contract date of December 1, 1985, despite the fact that it was clear that the measurements would not be completed by that date.

28. Moreover, in participating in modifying the agreement in the March 20, 1986, Bi-State Committee decision, the union again failed to protect the members' interests and, without securing any advantage, *negotiated away a provision* of extreme importance to the members. There is no evidence in the record showing that the union defendants did anything other than acquiesce in the delayed implementation of the new mileage rates.

29. In addition, the union representatives to the Negotiating Committee *negligently delegated their duties* to the mileage subcommittee without establishing any review mechanism for the subcommittee work to assure that the new mileage system would be implemented by December 1. The Carolina Negotiating Committee, consisting of union and employer representatives, unlawfully modified the contract by agreeing to give priority to trunk mileage recalibration over spur mileage recalibration and delegating the final say over the implementation date of the new mileage system to the Bi-State Committee, thereby effectively setting aside the six-month mileage adjustment provision of the contract which had been ratified by the union membership. The union then negligently agreed to allow the Bi-State Committee to hear a grievance on the issue of when the mileages would be paid, in spite of the fact that the contract clearly provided when the mileages would be paid. At that committee hearing, they failed to argue that the pay should be effective on December 1, 1985, as the contract provided. Similarly the union acted negligently in establishing the mechanism for measurement of mileages, because their representatives recognized that completion by the contract date was impossible, yet agreed to measure all of the trunk mileages first, and took no steps to speed up the measurement process.

30. Further, in *failing to submit the modification to the members for a vote*, it again breached its duty.

31. Finally, the union delayed hearing Walker's grievances, while at the same time acquiescing in the contract modifications that went to the heart of his grievance. Thus, the union acted against the interests of Walker and all other members seeking the proper implementation of the terminal-to-terminal provisions.

\*    \*    \*    \*    \*    \*

32. Shoddy or inept negotiating may not contravene a union's duty to represent its membership fairly. Here, however, the union's actions were worse than negligent. Local 71 completely failed to represent the members' wishes and secured no advantage for the members when they agreed to delay implementation.

33. Without ever calling for a ratification vote or objecting to the authority of the Bi–State Committee to change the implementation date, the local union left the issue of the implementation date to the Bi–State Committee, which had no power to negotiate changes in the agreement. Though Local 71 officials must have recognized by December 1 that the process had broken down, Sides stated that even at the time of the March, 1986, grievance hearing he expected payments to be retroactive to December 1, 1985. Yet the union representatives at the March meeting failed to even raise the issue of retroactivity! Sides deposition, pp. 99–100, 106, 118, 135, 139; Stipulated facts, para. 62, 64. Most surprisingly, though 90% of the runs had been calibrated by March 20, the union agreed without objection to a further six-week delay in payment. The union's concession on March 20 had a tremendous impact upon the drivers, but no reciprocal benefit was received in return. In short, the union simply gave away the drivers' entitlement to five months of terminal-to-terminal pay without a word of protest and without receiving anything in exchange.

34. A union's duty of fair representation is breached by *arbitrary or grossly negligent negotiation* of contracts. Thus, for example, in *Trail v. International Brotherhood of Teamsters*, 542 F.2d 961 (6th Cir.1976), the court found that a claim that a union had negotiated a wage rider that was below the already nationally negotiated contract level, and in violation of the union constitution, "knowing that it would be rejected by the membership," stated a cognizable claim for relief for violation of the union's duty of fair representation. *Id.* at 968.

35. *Failure to comply with terms of the IBT Constitution requiring a ratification vote* is a violation of the duty of fair representation. When a union negotiates an agreement or modification and then fails to obey its constitution and submit the negotiated change to the membership for a ratification vote, the union has breached its duty to represent the members fairly. In a case similar to the one before the court, a business agent agreed to a project which the members had twice rejected, and in contravention of the parent union's constitutional rights, which required that all collective bargaining agreements be approved by a majority of the affected locals. The court held that it was a "paradigm breach of this duty" of fair representation. *Alexander v. International Union of Operating Engineers*, 624 F.2d 1235, 1240–41 (5th Cir.1980).

36. In *Conroy v. Teamsters Local 705*, 124 LRRM 3240, 1985 WL 2560 (N.D.Ill. 1985) the defendant unions had negotiated a mid-term change of the seniority system *without informing the members* and *without submitting the change to the members for a vote*. The court thus found an issue of fact as to whether the union had breached its duty. *See also, Teamsters Local 310 v. NLRB*, 587 F.2d 1176 (D.C.Cir. 1978), and *Warehouse Union, Local 860 v. NLRB*, 652 F.2d 1022 (D.C.Cir.1981).

37. In *Livingston v. Ironworkers Local 812*, 647 F.Supp. 723 (W.D.N.C.1986), the court recognized that a union's *unfair conduct of a ratification* vote implicated the union's duty of fair representation, because the members had been given inadequate notice of the agreement's signing, and voided the agreement. Because the union here was clearly acting in contravention of the

members' interests, the union violated its duty to represent all of the members interests by failing to conduct such a vote.

38. The union breached its duty of fair representation in *its delay* in processing Walker's grievances. The grievances that Herman Walker filed in February and May concerning implementation of terminal-to-terminal mileage clearly had merit. The union and employer defendants acknowledge that implementation of terminal-to-terminal mileage was a major issue and that considerable time was devoted to it. Nevertheless, Walker's grievances were not heard until September 16, 1986, many months after they were filed. In *Harrison v. United Transportation Union*, 530 F.2d 558 (4th Cir.1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976), the court held that the failure to process an arguably meritorious grievance is evidence of bad faith sufficient to overcome a union's motion for a directed verdict in a breach of fair representation action. The Fourth Circuit in *Zimmerman v. French International School*, 830 F.2d 1316 (4th Cir.1987) followed similar reasoning in holding that the inference of bad faith created by delay was sufficient to defeat a union motion for summary judgment. When all of the circumstances leading to delayed implementation of the terminal-to-terminal mileage provisions in this case are considered together, the court concludes that there has been an arbitrary and capricious disregard for the contract and statutory rights of plaintiffs by the union defendants.

39. The employer defendants are liable for breach of contract because they knowingly agreed to circumvent the contract ratification procedures and modified the mileage adjustment provision of the contract without submitting the modification to the union membership for a ratification vote.

40. The amendment of the agreement in this case resulted in a breach of the wage provisions of the 1985 contract. Because the amendment was secured illegally by violation of the IBT Constitution, and through the Bi–State Committee, which acted without authority to negotiate contract amendments, the employer is estopped from relying on the amendment as a defense to his breach of the agreement.

41. It is well recognized that where an employer has had notice of the lack of authority of the union to enter into an agreement, no agreement is reached. *O'Mara v. Erie Lackawanna R.R. Co.*, 407 F.2d 674, 679 (2nd Cir.1969), *aff'd., Czosek, et al. v. O'Mara, et al.*, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970). Where the employer has knowledge of the ratification requirement, and this is the basis for the fair representation claim, the employer may also be found liable for breach of the contract or for having joined in the fair representation breach. *Sako v. Teamsters Local 705*, 125 LRRM 2372, 1987 WL 10981 (N.D.Ill.1987). In *Sako*, the court held that if the union were found to have breached its duty of fair representation in conduct of a ratification vote, the employer could be held liable for a continuing breach of the contract, by paying wages at concessionary level agreed upon by the union or by joining in the fair representation breach. In *Goclowski v. Penn Central*, 571 F.2d 747 (3rd Cir.1977), and *Rubberworkers Local 670 v. Rubberworkers*, 822 F.2d 613 (6th Cir.1987), the courts found that companies joined with the union representatives in their fair representation breaches.

42. Article XII(e) of the Teamsters Constitution mandates that all employers with Teamster contracts be provided with copies of all provisions of the Constitution requiring ratification. The employers have provided no evidence to suggest that they were unaware of this requirement, and in fact with their long bargaining history with the local union, it is assumed that they were aware of the ratification requirement. In addition, the employers have made no allegation that they relied on the union's apparent authority to enter into the agreement. Here, where the employer was also a party to the illegal negotiations procedures, they may be deemed to be aware that the contract modification was unlawful. *See,* e.g., *Parker v. Teamsters Local 413*, 501 F.Supp. 440, 450 (S.D.Oh.1980) *aff'd. without op*, 657 F.2d 269 (6th Cir.

1981), (employer breached collective bargaining agreement by implementing flexible workweek after it had participated in conduct which caused ratification election to be meaningless).

### E. *Breach of Contract.*

(Paragraphs 6 and 7 of Memorandum of Decision).

43. Defendants' decision to delay implementation of terminal-to-terminal mileage until May 4, 1986, without paying drivers retroactively to October 1 or December 1, 1985, amounted to an illegal midterm modification of the collective bargaining agreement.

44. Defendants breached plaintiffs' contractual rights by delaying the time specified in the Carolina Supplement for implementation of terminal-to-terminal mileage without the ratification vote required by the IBT Constitution. Plaintiffs are therefore entitled to relief under both § 301 of the LMRA and § 101(a) of the LMRDA, 29 U.S.C. §§ 185 and 411. The union's failure to submit the contract modification created by the Bi–State Committee decision to the affected members for a ratification vote violated section 101(a))(1) of the LMRDA. *Sako v. Teamsters Local 705, supra; Bauman v. Presser,* 117 LRRM 2393, 1984 WL 3255 (D.D.C.1984).

45. Plaintiffs and other union members are entitled to an equal right to vote in union referenda, pursuant to 29 U.S.C. § 411(a)(2). Although this statutory provision does not require that any particular matter be submitted to union members for their ratification, if the union's constitution and bylaws require ratification, those constitutional provisions are enforceable under this section.

46. The International Brotherhood of Teamsters Constitution accords plaintiffs the right to vote on mid-term contract modifications. The Constitution also requires that employers negotiating contracts with the unions be apprised of the ratification requirements.

47. Under the LMRDA, 29 U.S.C. § 401 *et seq.* (1982), unions have an affirmative duty to ensure that "[e]very member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization...." 29 U.S.C. § 411(a)(1) (1982).

48. This "equal rights" provision is part of the union members' Bill of Rights, contained in Title I of the LMRDA. The LMRDA, enacted in 1959, was a direct result of hearings of the Senate Select Committee on Improper Activities in the Labor or Management Field, known as the McClellan hearings. The hearings disclosed massive corruption controlling certain American labor unions, particularly the Teamsters and the Longshoremen. Much of the testimony focused on the ties between union corruption and inadequate membership representation. The hearings included testimony on Union officers who negotiated contracts in disregard or even defiance of their members' wishes. *See* Morris (ed.), *The Developing Labor Law* (2d ed. 1983), pp. 49–60 for a summary of legislative history leading to LMRDA enactment.

49. Title I of the LMRDA was broadly fashioned after the Bill of Rights of the United States Constitution to remedy problems of inadequate representation of union members. It was designed to enable "the members ... to determine the course of their organization ..." *Navarro v. Gannon,* 385 F.2d 512, 518 (2nd Cir.1967). To achieve that purpose, courts have recognized that under the equal rights provision of Title I, union members may enforce constitutional provisions that provide them with a ratification vote on contracts or contract modifications. See, *Bunz v. Moving Picture Machine Operators Local 224,* 567 F.2d 1117 (D.D.C.1977) (enforcing the bylaws provision requiring a two-third vote for assessment, and invalidating union adoption of an assessment with a 59% majority); *American Postal Workers Union Local 6885 v. APWU,* 665 F.2d 1096, 1108 (D.C.Cir.1981) (where local union was excluded from ratification vote in violation of constitution, Section 101(a)(1) was violated); and *Christopher v. Safeway Stores,* 644

F.2d 467, 468–71 (5th Cir.1981) (because union's constitution provided that all 'major propositions' affecting the local union must be approved at a membership meeting, and no vote was taken, Title I was violated). *See also, Bauman v. Presser,* 117 LRRM 2393, 1984 WL 3255 (D.D.C.1984); *Sako v. Teamsters Local 705,* 125 LRRM 2372, 1987 WL 10981 (N.D.Ill.1987).

50. The teamsters have frequently used the mid-term modification provisions in the IBT Constitution to provide members with a vote. Several courts have recently examined the Constitutional language in Article XII and have determined that a ratification vote was called for under the facts presented. Thus, in *Sako v. Teamsters Local 705, supra,* the court examined the claims of members who alleged that the union utilized improper procedures in a ratification vote. In denying the union's claim that the court had no jurisdiction because the parties had no right to a referendum, the court examined the local bylaws and the Teamsters Constitution, and found that such a right was present. In *Conroy v. Teamsters Local 705,* 124 LRRM 3240, 1985 WL 2560 (N.D.Ill.1985), the court found that a negotiated change in bidding procedures had not been submitted to the members, and found that an issue of fact as to whether the union's duty to fairly represent the members existed, because "proper voting and disclosure had not been followed." *Conroy* is especially significant because the negotiated change at issue was not a change in contract language. Rather, it was a change in past practice between the employers and the union. *See also, Bauman v. Presser,* 117 LRRM 2393, 1984 WL 3255 (D.D.C.1984) (midterm modification of the national UPS contract improper under Teamsters Constitution; members deprived of meaningful vote because of short discussion period); *Parker v. Teamsters Local 413,* 501 F.Supp. 440 (S.D.Oh.1980), *aff'd without op.,* 657 F.2d 269 (6th Cir.1981).

51. The cases referred to above, as well as *Lewis v. Teamsters Local 771,* 826 F.2d 1310 (3rd Cir.1987), show that ratification votes are common in the union, for everything ranging from a reopening of a national agreement (*Bauman, supra*), to a change in the procedures road drivers use to vote on their bids (*Conroy, supra*), or hold seniority. A ratification vote should have been held before implementation of terminal-to-terminal mileage was delayed. The evidence in the record establishes that terminal-to-terminal pay was a major "improvement" in the 1985 and the union's negotiation of a later implementation date was a form of wage *concession.* The importance of the change to the drivers cannot seriously be derided by the union, because it was the very first change that President Sides announced to the members at the meeting concerning the 1985 Carolina Supplement. Walker, Colesworthy and Slaughter testimony.

52. In delaying implementation, the grievance committee created a significant change in the contract language, and deprived the affected members of a long sought term and condition of employment.

53. By refusing to implement the new mileage pay system by the date required in the contract, and by failing to pay the mileages from the date set forth in the contract, the defendant employers breached the collective bargaining agreement.

54. By knowingly agreeing to circumvent the contract ratification procedures, the employers joined with the union defendant in their breach of the duty of fair representation. *Rubberworkers Local 670 v. Rubberworkers, Goclowski, Sako,* supra.

## JUDGMENT

Based upon the findings of fact and conclusions of law set forth in the accompanying memorandum, the court enters judgment as follows:

1. The employer defendants are ORDERED to pay back pay based upon gate-to-gate mileage to affected drivers retroactive to December 1, 1985;

2. The court will leave to the parties the task of calculating and distributing back pay. However, the court will retain jurisdiction in the event that disputes arise as to the proper calculation or distribution of back pay; and

3. Counsel for plaintiffs are directed to file their motion for attorney fees within 45 days. The issue of apportionment of attorney fees among the defendants will be resolved by the court when it rules upon plaintiffs' motion for attorney fees. If defendants appeal this judgment prior to that time, then the motion for attorney fees need not be filed until all matters on appeal have been resolved.